FILED
2007 Sep-06  AM 11:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **DR. ALEXANDER McELROY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **LAWRENCE COUNTY BOARD OF** | ) | |
| **EDUCATION, and DEXTER** | ) | **Civil Action No. 04-S-2525-NE** |
| **RUTHERFORD, GERRY MOSES,** | ) | |
| **LEE LANGHAM, WADE** | ) | |
| **HARRISON, WENDALL LOGAN,** | ) | |
| **and JOHN STONE, in their official** | ) | |
| **and individual capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Alexander McElroy holds bachelor's and master's degrees in criminal justice, an additional master's degree in special education, a doctorate of education focusing on educational leadership, and a certificate from the State of Alabama Department of Education allowing him to serve as a public school educational administrator.[1]  He also has five years' experience as a military science instructor at the University of

---

[1] *See*, *e.g.*, doc. no. 39 (Defendants' Brief in Support of Summary Judgment), Statement of Undisputed Facts, ¶¶ 19, 22, 24, 30, 31; doc. no. 53 (Plaintiff's Brief in Opposition to Summary Judgment), Statement of Undisputed Facts, ¶ 123.  *See also* Affidavit of Alexander McElroy ("McElroy Aff."), p. 2.  ***Nota bene***:  the manner in which the parties docketed their evidentiary submissions in this case makes citation to those submissions by document number difficult. Accordingly, briefs and pleadings will be cited by document number, but affidavits and depositions will be cited by title.

North Alabama and, in 1999, he began teaching special education at Hazlewood High School in Lawrence County, Alabama.[2]  Between 2002 and 2005, McElroy allegedly offered these credentials in support of his application for *twenty-six* principal or assistant principal openings in public schools within the jurisdiction of the Lawrence County Board of Education.[3]  He was interviewed on at least one occasion, but never hired.

This lawsuit concerns nine of those alleged applications.  In each case, McElroy claims that his misfortune stemmed not from lack of qualification, but from invidious racial discrimination:  *i.e.*, McElroy is an American citizen with African ancestors, whereas all of the individuals hired for the nine positions at issue in this action were of Caucasian descent.[4]  What is more, after being overlooked for several positions in 2003, McElroy filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and he suspects that his continued inability to advance in Lawrence County public schools is causally connected to this protected activism as well.[5]

In an effort to avenge this claimed discrimination, McElroy filed suit against

---

[2] Doc. no. 39, Statement of Undisputed Facts, ¶¶ 21, 25; McElroy Aff., pp. 1, 3.

[3] McElroy Aff., pp. 3-4.

[4] Doc. no. 53, Statement of Undisputed Facts, ¶¶ 122, 142, 146, 151, 158, 167, 175, 185, 210-211, 226-227.

[5] *Id*. at ¶¶ 261-263.

the Lawrence County Board of Education, each of its individual members (in both their personal and official capacities), and the Lawrence County Superintendent of Education (also in his personal and official capacity).[6]  His complaint asserts causes of action under three federal statutes — Title VII of the Civil Rights Act of 1964, *codified as amended at* 42 U.S.C. § 2000e *et seq*.; the Civil Rights Act of 1871, *codified as amended at* 42 U.S.C. § 1983; and the Civil Rights Act of 1866, *codified as amended at* 42 U.S.C. § 1981.[7]  All defendants have jointly moved for summary judgment on various grounds, and McElroy has conceded certain aspects of the motion.[8]  For the reasons stated below, their motion will be granted in part and denied in part.

## PART ONE

### *Summary Judgment Standards*

Federal Rule of Civil Procedure 56 provides, in part, that summary judgment not only is proper, but "*shall be* rendered *forthwith* if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

---

[6] Doc. no. 8 (Amended Complaint).

[7] *Id*. at ¶ 1.

[8] Doc. no. 38 (Defendants' Motion for Summary Judgment).  Specifically, McElroy concedes that certain named defendants must have the claims against them dismissed, at least to a certain extent.  These concessions are discussed in Part Three of this opinion.

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis supplied).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment,

after adequate time for discovery and upon motion, against a party who fails to make

a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all

reasonable inferences in favor of the party opposing summary judgment." *Chapman*

*v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v.*

*City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-

moving party are not unqualified, however.  "[A]n inference is not reasonable if it is

only a guess or a possibility, for such an inference is not based on the evidence, but

is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d

1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is material to an issue affecting the
> outcome of the case.  The relevant rules of substantive law dictate the
> materiality of a disputed fact.  A genuine issue of material fact does not
> exist unless there is sufficient evidence favoring the nonmoving party
> for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921).  *See also Anderson v.*

*Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## PART TWO

### *Consolidated Recitation of the Facts and Legal Analysis*

As mentioned at the beginning of this opinion, McElroy asserts claims arising out of his nonselection for nine positions over the course of approximately one year. Even though defendants denounce his complaint as mixing nine different lawsuits as one,[9] there is nothing inherently improper about McElroy asserting all of his claims in one action. Indeed, Federal Rule of Civil Procedure 18 states that "[a] party asserting a claim to relief . . . may join, either as independent or as alternate claims, as many claims . . . as the party has against an opposing party." Fed. R. Civ. P. 18(a). On the other hand, common sense teaches that, often, less is more. Hence, the joinder of distinct causes of action in one pleading runs the risk of confounding a plaintiff's claims.[10] Moreover, the volume of factual information that must be discussed in order to resolve the present motion — which attacks *each* of plaintiff's claims, sometimes from more than one angle — is staggering. Accordingly, in an effort to avoid prolix

---

[9] *See* doc. no. 77, p. 21.

[10] *See* Black's Law Dictionary 1041 (8th ed. 2004) (defining, *e.g.*, the term "multifarious").

statements of fact and to minimize confusion, the court's factual summary and discussion of law appear in combined (but not truncated) form. This streamlined approach means that the court will recite the relevant facts concerning a particular position, and then immediately connect that recitation with an analysis of the viability of any claims arising out of McElroy's nonselection for that position. Even before doing that, however, it is necessary to set the stage with a synopsis of the applicable principles of law.

## A.    The Legal Framework

### 1.    Title VII:  Failure to Promote

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's *race*, *color*, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1) (emphasis supplied).[11]

---

[11] The full text of this keystone provision of the Civil Rights Act of 1964, as amended, reads as follows:

It shall be an unlawful employment practice for an employer—
**(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
**(2)** to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

The broad anti-discrimination principle set forth by this language encompasses situations in which an employer intentionally fails to promote an individual because of that individual's race. *See, e.g., Vessels v. Atlanta Independent School System*, 408 F.3d 763, 768 (11th Cir. 2005). Of course, actually proving that an employer relied upon race in rejecting a request to be promoted — *i.e.,* "proving that intentional discrimination motivated the employer," *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004) — is rarely a straightforward undertaking.

> Frequently, acts of discrimination may be hidden or subtle; an employer who intentionally discriminates is unlikely to leave a written record of his illegal motive, and may not tell anyone about it. . . . Because of these realities, plaintiffs are often obliged to build their cases entirely around circumstantial evidence. The unique proof problems that accompany discrimination cases are the genesis of the unique solutions that the Supreme Court has devised for those cases in *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973),] and its progeny.

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1537 (11th Cir. 1997).

Thus, where (as here) there is no direct evidence of discrimination, the plaintiff bears the initial burden of establishing a *prima facie* case of an employer's intent to discriminate on the basis of race. *E.g., Vessels*, 408 F.3d at 767 (citing *McDonnell Douglas*, 411 U.S. at 802). In the context of a failure to promote claim, the plaintiff must at least create an issue of fact as to the following elements in order to establish

---

42 U.S.C. § 2000e-2(a).

a *prima facie* case:  (1) he is a member of a protected class; (2) he applied for, and was qualified to fill, a position for which the defendant was accepting applications; (3) despite his qualifications, he was rejected for the position; and (4) after his rejection, the employer *either* kept the position open, *or* filled it with a person outside plaintiff's protected class.  *See*, *e.g.*, *Vessels*, 408 F.3d at 768; *Walker v. Mortham*, 158 F.3d 1177, 1179 n.2, 1185-93 (11th Cir. 1998) (explaining that a plaintiff need not introduce evidence of the relative qualifications of the person promoted instead of plaintiff as part of his *prima facie* case for failure to promote).[12]  "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee."  *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1973).  *See also Vessels*, 408 F.3d at 767.

---

[12] Although defendants made no argument whatsoever concerning the *prima facie* case in their initial brief, in subsequent filings the parties began to dispute the proper formulation of the final element thereof.  Defendants argue that the court should adhere to Eleventh Circuit panel opinions in which the final element is designed to require proof "that other equally or less qualified employees who were not members of the protected class were promoted."  *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001).  *See also Wilson*, 376 F.3d at 1088; *Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir. 2003); *Taylor v. Runyon*, 175 F.3d 861, 866 (11th Cir. 1999).  McElroy cites to the formulation enunciated in the main text above as the proper standard.

For the reasons stated in *Walker v. Mortham*, 158 F.3d 1177, 1185-93 (11th Cir. 1998), and *Bernstein v. Sephora*, 182 F. Supp. 2d 1214, 1221 (S.D. Fla. 2002), the court sides with McElroy on this issue.  The court understands the confusion; various panels within the Eleventh Circuit have been inconsistent in the pattern of words used to describe the final element of a failure to promote *prima facie* case.  Nevertheless, *Walker* provides a detailed analysis of the reasons for rejecting a relative qualification requirement, and subsequent panels have made no attempt to confront and dispute the *Walker* court's conclusion.  Indeed, most recently, the panel in *Vessels* took pains to *endorse* the same formulation that *Walker* followed.  *See Vessels*, 408 F.3d at 768.

"The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action." *Combs*, 106 F.3d at 1528 (citing *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254). The employer's burden at the second stage of analysis "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)). "To satisfy that burden of production, '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 254-55 (citation and footnote omitted)). Indeed, "the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257.

If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *id.*, then the "rebuttable presumption"

of discrimination created by the demonstration of a *prima facie* case[13] is refuted, "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10.

In this final step of the analytical process, the burden shifts back to the plaintiff to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely a pretext for intentional discrimination. *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804). *See also Wilson*, 376 F.3d at 1088 ("If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. Quarreling with that reason is not sufficient.") (internal citation omitted). The plaintiff shoulders that burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996)) (internal

---

[13]*See Burdine*, 450 U.S. at 254 n.7 (explaining that, in the *McDonnell Douglas* context, the phrase "*prima facie* case" is used to "denote the establishment of a legally mandatory, rebuttable presumption [of discrimination]").

quotations omitted).  *But see also Brooks v. Jefferson County Commission*, 446 F.3d 1160, 1163 (11th Cir. 2006) ("A reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'") (internal citation omitted) (emphasis in original).

If a plaintiff demonstrates pretext, he "is entitled to survive summary judgment," *Combs*, 106 F.3d at 1529, *except* in the rare case where, notwithstanding the evidence of pretext, "no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 134-35.  *See also Brooks*, 446 F.3d at 1163.  In any case, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

### 2.     Title VII:  Retaliation

McElroy also alleges that he was a victim of retaliation for pursuing administrative relief for the racial discrimination that he perceived.  "Retaliation is a separate violation of Title VII." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000).  In the absence of direct evidence of retaliatory motive, the *McDonnell Douglas* burden shifting analysis also applies to retaliation claims under Title VII.  *See Hurlbert v. St. Mary's Health Care System*, *Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).  Since that analysis has already been explicated, it is only necessary

to recite the *prima facie* elements of a retaliation claim.

Generally speaking, proving a *prima facie* case of retaliation requires proof of three elements:  (1) the plaintiff engaged in statutorily protected activity — *i.e.*, "he opposed any practice made an unlawful employment practice by [Title VII], or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]," 42 U.S.C. § 2000e-3(a); (2) he thereafter suffered an adverse employment action; and (3) there is a causal linkage between the plaintiff's protected activity and the employer's adverse employment action.  *E.g.*, *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Gupta*, 212 F.3d at 587; *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998).

### 3.    Sections 1981 and 1983:  Failure to Promote and Denial of Equal Protection

Finally, McElroy pursues claims under 42 U.S.C. §§ 1981 and 1983.  *Cf. Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48 (1974) (noting that claimants may simultaneously pursue relief under Title VII and other federal anti-discrimination statutes).  Section 1981 provides, in part, that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and

enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).[14]  The

term "make and enforce contracts" is defined to include, among other things, "the

making, performance, modification, and termination of contracts."  42 U.S.C. §

1981(b).  This language imparts a cause of action for failure to promote on the basis

of race.  *See*, *e.g.*, *Goodgame v. American Cast Iron Pipe Co.*, 75 F.3d 1516, 1518

(11th Cir. 1996) (citing 42 U.S.C. § 1981(b), and holding that the post-1991 amended

version of § 1981 is "applicable to all promotion claims"); *Crawford v. Western*

*Electric Co.*, *Inc.*, 614 F.2d 1300, 1315 n.27 (5th Cir. 1980) (describing § 1981 as "a

parallel remedy against [racial] discrimination which . . . derive[s] its legal principles

from Title VII.").[15]

     The Eleventh Circuit has long recognized that section "1981 and 1983

[employment discrimination] claims require the same elements of proof as a Title VII

action."  *Palmer v. District Board of Trustees of St. Petersburg Junior College*, 748

F.2d 595, 596 n.2 (11th Cir. 1984) (citing *Whiting v. Jackson State University*, 616

F.2d 116, 121 (5th Cir. 1980)).  *See also Brown v. American Honda Motor Co.*, *Inc.*,

---

[14] Subsection (c) makes clear that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."  42 U.S.C. § 1981(c).

[15] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

939 F.2d 946, 949 (11th Cir. 1991) ("Section 1981 requires proof of *intentional* discrimination. . . . The Supreme Court has held that the test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases.") (citations omitted) (emphasis in original). Accordingly, the court will "explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well." *Standard v. A.B.E.L. Services*, *Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

Section 1983 is broader than § 1981. Section 1981 is a purely substantive law that, as discussed, makes racial discrimination in the making, modification, or enforcement of contracts illegal. *See Johnson v. Railway Express Agency*, *Inc.*, 421 U.S. 454, 459-60 (1975). On the other hand, § 1983 is a procedural tool that allows aggrieved United States citizens to sue for "the deprivation [under color of state law] of any rights, privileges, or immunities secured by the Constitution *and* laws [of the United States]." 42 U.S.C. § 1983 (emphasis supplied). As different as they are, these statutes share one curious commonality: neither, standing alone, can form the basis for a lawsuit against a state actor. Section 1981 "creates a *right* that private or state actors may violate but does not itself create a *remedy* for that violation." *Butts v. County of Volusia*, 222 F.3d 891, 894 (11th Cir. 2000) (emphasis supplied). Conversely, § 1983 "is not itself a source of substantive rights, but merely provides

-14-

a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotations and citations omitted).

Thus, "§ 1983 constitutes the exclusive remedy against state actors for violations of the rights contained in § 1981," *Butts*, 222 F.3d at 893, and McElroy's § 1981 claims are due to be merged into his § 1983 claims. *See*, *e.g.*, *Vason v. City of Montgomery*, 240 F.3d 905, 906 n.1 (11th Cir. 2001) (holding that it was proper for the district court to merge the plaintiff's § 1981 claim into her § 1983 claim). In terms of analysis, this merger will not be noticeable; "[i]n a case such as this alleging disparate treatment, in which § 1983 is employed as a remedy for the same conduct attacked under Title VII, 'the elements of the two causes of action are the same.'" *Richardson v. Leeds Police Department*, 71 F.3d 801, 805 (11th Cir. 1995) (quoting *Cross v. Alabama*, 49 F.3d 1490, 1508 (11th Cir. 1995) (in turn quoting *Hardin v. Stynchcomb*, 691 F.2d 1364, 1369 n.16 (11th Cir. 1982)).[16]

But § 1983 does more than merely allow McElroy to bring his § 1981 claim before the court. After all, the statute "was enacted for the express purpose of 'enforc[ing] the provisions of the Fourteenth Amendment.'" *Mitchum v. Foster*, 407

---

[16] Of course, there is one additional element of proof — it must be shown that the conduct complained of was committed by someone acting under color of state law. *See*, *e.g.*, *Burch v. Appalachee Community Mental Health Services*, *Inc.*, 840 F.2d 797, 800 (11th Cir. 1988) (*en banc*), *aff'd sub nom*. *Zinermon v. Burch*, 494 U.S. 113 (1990).

U.S. 225, 238 (1972) (internal citations omitted) (bracketed alteration supplied).  The

Equal Protection Clause of the Fourteenth Amendment forbids state actors from

discriminating on the basis of race in making official decisions — including decisions

related to public employment — and § 1983 provides a means of enforcing that

prohibition.  *See*, *e.g.*, *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1478 (11th

Cir. 1991); *Adams v. Cobb County School District*, No. 06-15103, 2007 WL 1720430,

at * 2 n.5 (11th Cir. June 15, 2007).

Again, however, there is no substantive distinction between the analysis of the

Title VII claims and the Equal Protection Clause-based § 1983 claims, except the

requirement that a state actor be involved in the adverse decisionmaking.  *See Snider*

*v. Jefferson State Community College*, 344 F.3d 1325, 1328 n.4 (11th Cir. 2003)

(noting that "when section 1983 is used as a parallel remedy for violation of section

703 of Title VII, the elements of the two causes of action are the same") (internal

bracketing, emphasis, and quotations omitted); *Adams*, 2007 WL 1720430, at * 2 n.5

("We do not treat Adams's (equal protection-based) failure-to-promote claim against

the District separately from his Title VII failure-to-promote claim against the

District.") (citing *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985)).

With the legal groundwork laid, the court turns to the facts of the instant case.

**B.     Background Information**

County primary and secondary school systems in the State of Alabama are administered most visibly by county boards of education.[17]  Under state law, county boards of education generally are composed of five elected members.[18]  The chief executive officer of county boards of education and county school systems is the superintendent of education,[19] who either may be appointed by the board or selected by direct vote of the county's qualified voters in partisan election contests.[20]

All employment, promotion, demotion, transfer, suspension, and discharge decisions regarding lower county public school employees are governed by statute:

> The county superintendent of education shall nominate in writing for appointment by the county board of education all principals, teachers and all other regular employees of the board.  He shall assign them to their positions, transfer them as the needs of the schools require, recommend them for promotion, suspend them for cause and recommend them for dismissal, subject to the provisions of Chapter 24 of this title.[21]

The county board of education, on the other hand, "shall appoint, upon the written

---

[17] *See* Ala. Code § 16-8-8 (1975) (2001 Replacement Vol.) ("The general administration and supervision of the public schools of the educational interests in each county . . . shall be vested in the county board of education[.]"); *id*. at § 16-8-9 ("The county board of education shall exercise through its executive officer, the county superintendent of education and his professional assistants control and supervision of the public school system of the county.").

[18] *See id.* at § 16-8-1.

[19] *See id.* at §§ 16-8-7, 16-9-1.

[20] *See*, *e.g.*, *id*. at § 16-9-2(a).

[21] *See id*. at § 16-9-23.  Chapter 24 of Title 16 of the Code of Alabama pertains to the "tenure" protections of "all persons regularly certified by the teacher certificating authority of the State of Alabama who may be employed as instructors, principals or supervisors in the public elementary and high schools of the State[.]"  *Id*. at § 16-24-1.

recommendation of the county superintendent, all principals, teachers, clerical and professional assistants authorized by the board."[22]

Essentially, then, the superintendent proposes, and the board disposes: *i.e.*, the superintendent recommends persons for appointment or promotion to, or removal from, the various teaching, supervisory, or other employment positions within the school system, and the board either sustains or overrules the superintendent's written proposal by majority vote. In fewer words, the county board of education is the final decisionmaking authority with regard to hiring matters.[23] Even so, in view of the fact that a county board of education lacks the statutory authority to make any employment decision in the absence of a written recommendation by the superintendent, he, also, is a critical player in the final decisionmaking process.

During all times relevant to this action, defendant Dexter Rutherford served as Superintendent of Education for Lawrence County, Alabama, and the Lawrence County Board of Education was comprised of defendants Lee Langham, Gerry Moses, Wade Harrison, Wendall Logan, and John Stone.[24] All of these individuals worked together to fill job vacancies within the Lawrence County school system as

---

[22] *See id.* at § 16-8-23.

[23] *See*, *e.g.*, Deposition of Dexter Rutherford ("Rutherford Depo."), p. 52, lines 19-20.

[24] *Id.* at p. 20, line 17 - p. 21, line 4; Affidavit of Dexter Rutherford ("Rutherford Aff."), ¶ 1; doc. no. 8, ¶ 7.

they arose.

With respect to principal and assistant principal openings, it appears the selection process generally commenced with the posting of a vacancy announcement by the Board of Education, though Alexander McElroy claims that some announcements were not posted.[25]  In any event, once applications were received, Rutherford would "either [unilaterally] formulate personnel recommendations for consideration by the Board or review recommendations made by other supervisory employees and, if [he] concur[red] with those recommendations, forward them to the Board for consideration and possible action."[26]  Whether Rutherford would make independent recommendations or simply evaluate the recommendations of other supervisory employees depended upon the position at issue.[27]

For principal positions, applications would be directed to Rutherford , who would personally conduct interviews of selected candidates, and then issue a recommendation to the Board of Education.[28]  In addition to considering interview performance, Rutherford evaluated principal aspirants with reference to their "general

---

[25] *See*, *e.g.*, doc. no. 39, Statement of Undisputed Facts, ¶ 9; doc. no. 53, Statement of Undisputed Facts, ¶¶ 143, 148, 153, 156, 163, 170, 182, 204, 212, 135.

[26] *See*, *e.g.*, Rutherford Aff., ¶ 1.

[27] *See id*. at ¶ 3.

[28] *See*, *e.g.*, Rutherford Depo., p. 42, lines 3-6; *id*. at p. 46, lines 1-6; doc. no. 39, Statement of Undisputed Facts, ¶ 11.

educational background and experience, . . . familiarity with the school environment and the needs of the community served by the school, and any special strengths or aptitudes presented by the applicant."[29]  In his opinion, however, "the most important qualification for a principal . . . is relevant administrative experience."[30]  Finally, Alabama law requires that both principals *and* assistant principals possess one of several state-issued certificates (*e.g.*, a superintendent-principal certificate, a principal certificate, or an educational administrator endorsement) as a condition precedent to employment in such capacity; consequently, Rutherford was necessarily obliged to ensure that recommended individuals met this minimum benchmark.[31]

The selection process differed with respect to assistant principal positions. Generally, "candidates for assistant principalships [were] interviewed initially by the principal of the school to which the assistant principal would be assigned."[32]  That is not to say that Rutherford completely delegated his recommendation duties to the principals.  He would routinely "provide[] guidance to principals in connection with the interviewing process by assessing the principal's administrative strengths and

---

[29] Rutherford Aff., ¶ 4.

[30] *Id*. at ¶ 2.

[31] *Id*. at ¶ 4; doc. no. 53, Statement of Undisputed Facts, ¶¶ 124-126; Deposition of Dr. Allen Jeffreys ("Jeffreys Depo."), Ex. 85 (State of Alabama Professional Employee Personnel Codes), pp. 11-12.  *See also* Ala. Code §§ 16-23-1, 16-24-1; Ala. Admin. Code § 290-3-2-.01(2).

[32] Doc. no. 39, Statement of Undisputed Facts, ¶ 14.

encouraging the principal to identify candidates whose abilities would complement his or her leadership style."[33]   Moreover, Rutherford "generally reviewed and discussed a principal's recommendation for assistant principal with the principal after receiving it, and before [presenting his own recommendation to the Board]."[34] Nevertheless, Rutherford testified that he never rejected any recommendation made to him by a principal.[35]

Once Rutherford's final recommendation was submitted to the Board — typically "three days in advance of the meeting at which action on the recommendation was scheduled to be taken"[36] — the individual members were free to reach out to Rutherford informally to pose follow-up questions.[37]   Again, however, there is no evidence in the record that the Board ever overruled any of Rutherford's recommendations.

## C.   McElroy's Applications

### 1.   Round one:  May - July 2003

McElroy first applied for an administrative position with the Lawrence County

---

[33] *Id*. at ¶ 15.

[34] *Id*. at ¶ 16.

[35] Rutherford Depo., p. 74, lines 1-6.

[36] Doc. no. 39, Statement of Undisputed Facts, ¶ 11.

[37] *Id*. at ¶ 12.

schools on July 31, 2002,[38] approximately three years after he accepted "his first public school teaching appointment as a special education teacher at Hazlewood High School [in 1999]."[39]  Although he did not receive favorable consideration on that application, it is not a part of this lawsuit.  Beginning just under one year later, however, in the spring and summer of 2003, McElroy claims to have renewed his quest for advancement by submitting *five* applications in response to posted openings for principalships — one each at Moulton Elementary School, East Lawrence Middle School, East Lawrence High School, Speake School, and Hatton High School.[40] Additionally during that period, McElroy claims he applied for an allegedly unposted assistant principalship opening at Lawrence County High School,[41] and "attempted to apply" for what he contends was an unposted opening for assistant principal at Hatton High School.[42]

It is undisputed that each of these seven listings required a successful candidate to possess, at minimum, a master's degree and certification to serve as a principal (or

---

[38] McElroy Aff., p. 3.

[39] Doc. no. 39, Statement of Undisputed Facts, ¶ 25.

[40] Doc. no. 53, Statement of Undisputed Facts, ¶¶ 143, 145, 148, 149, 153, 156, 161, 163, 169, 170, 172, 178.

[41] *Id.* at ¶¶ 135, 138.

[42] Doc. no. 1, ¶ 16; doc. no. 53, Statement of Undisputed Facts, ¶¶ 182, 201-203.

assistant principal in the case of the assistantship openings) in Alabama schools.[43]

McElroy possessed all of these qualifications,[44] but in each case a Caucasian

applicant was chosen for the position.[45]

### a.    The principalships

Before examining the facts surrounding the individual principalships at issue,

several global observations can be made.  For starters, McElroy did not receive an

interview for any of the five principalships to be discussed in this section.[46]

Incidentally, since Rutherford only kept records of those applicants whom he actually

interviewed, he cannot confirm that McElroy even *applied* for all of these positions.[47]

Nevertheless, in responding to McElroy's proposed undisputed facts, defendants have

failed to specifically deny his allegations that he did apply for these five

principalships.[48]  Moreover, in their briefs, defendants make no effort to argue that

McElroy lacks sufficient proof of application.  *See*, *e.g.*, *Continental Technical*

---

[43] Rutherford Depo., Ex. 22, Ex. 27, Ex. 30, Ex. 32, Ex. 34, Ex. 36, Ex. 37; Supplemental Affidavit of Dexter Rutherford ("Dexter Supp. Aff."), Ex. A.

[44] *E.g.*, doc. no. 39, Statement of Undisputed Facts, ¶¶ 19, 22, 24, 30, 31; doc. no. 53, Statement of Undisputed Facts, ¶ 123.

[45] Doc. no. 53, Statement of Undisputed Facts, ¶¶ 142, 146, 151, 158, 167, 175, 185.

[46] *Compare* doc. no. 53, Statement of Undisputed Facts, ¶¶ 145, 147, 149, 152, 160, 161, 166, 169, 178 *with* doc. no. 77 (Defendants' Reply in Support of Summary Judgment), Statement of Undisputed Facts, ¶¶ 145, 147, 149, 152, 160, 161, 166, 169, 178.

[47] *See*, *e.g.*, Rutherford Depo., p. 222, lines 1-20.

[48] *See* doc. no. 77, Statement of Undisputed Facts, ¶¶ 138, 145, 147, 149, 161, 169, 178.

*Services*, *Inc. v. Rockwell International Corp.*, 927 F.2d 1198, 1199 (11th Cir. 1991)

("An argument not made is waived[.]").  Indeed, defendants do not take issue with

McElroy's *prima facie* case at all, so the court will assume that it is satisfied.  Instead,

the thrust of defendants' argument is that they have asserted legitimate,

nondiscriminatory reasons for failing to promote McElroy, most of which appear to

relate to qualification disparities between him and the other candidates.[49]  Those

purported reasons, and McElroy's arguments concerning them, are discussed below.

### i.    Moulton Elementary School

The Board posted a vacancy announcement for a principalship at Moulton

Elementary School on May 5, 2003.[50]  Earl Leonard, a Caucasian man, was selected

to fill the vacancy.[51]  Rather than stating the particular reason or reasons why Leonard

---

[49] McElroy argues that defendants have failed to actually *articulate* specific reasons for their actions, so as to discharge their burden of production at the summary judgment stage.  *See id*. at pp. 28-32.  *See also Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir. 2000).  The court will confront this argument as the following discussion unfolds, but pauses at this stage to reject one variation of it.  McElroy suggests that the court is bound — under the "law of the case" doctrine — to hold that defendants have failed to assert a nondiscriminatory reason for their actions because, after reviewing the initial brief, the court ordered them to provide a revised statement of such reasons, and the revised statement that was tendered was nothing more than a reformatted version of the original statement.  *See* doc. no. 57, p. 31.  The "law of the case" doctrine, however, "operates to preclude courts from revisiting issues that were decided explicitly or by necessary implication in a prior *appeal*."  *Schaivo ex rel. Schindler v. Schaivo*, 403 F.3d 1289, 1291 (11th Cir. 2005) (emphasis supplied).  Thus, the doctrine has no application to issues arguably decided by implication in prior orders of the district court.  *See id*.

[50] Doc. no. 53, Statement of Undisputed Facts, ¶ 143.

[51] Doc. no. 39, Statement of Undisputed Facts, ¶ 33; doc. no. 53, Statement of Undisputed Facts, ¶ 146.

-24-

was chosen over McElroy, defendants have listed Leonard's qualifications and insinuated that they are superior to McElroy's credentials.  In particular, defendants point out that, at the time he was hired, Leonard possessed roughly five years of experience as a principal at Speake School, five additional years of experience as an assistant principal at Speake School, and five years of teaching experience.[52]

Simple regurgitation of the successful candidate's résumé, however, is not equivalent to stating the *rationale* for that person's selection.  "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the *reasons* for the plaintiff's rejection."  *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981) (emphasis supplied).  *See also id*. at n.9 (noting that "the defendant cannot meet its burden through . . . an argument of counsel"); *Steger v. General Electric Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003) ("A defendant may not merely state that the employment decision was based on the hiring of the 'best qualified' applicant, but must articulate specific reasons for that applicant's qualifications[.]").  The court has thoroughly searched the record and cannot find a single place in Rutherford's deposition in which he claims that he chose to recommend Leonard on the basis of his experience, or chose to overlook McElroy due

---

[52] Doc. no. 39, Statement of Undisputed Facts, ¶ 34.  *See also* Rutherford Depo., p. 262, lines 6-13.

to Leonard's superior experience.  *Cf. Alexander v. Fulton County*, 207 F.3d 1303, 1342 (11th Cir. 2000) (allowing a jury verdict in favor of the plaintiff to stand where the decisionmaker, "Sheriff Barnett, . . . failed to identify *any* specific qualifications of [the successful candidate] that explained his appointment," and "offered *no* reason, let alone a legitimate race-neutral reason, to explain the promotion of [that candidate] and not [the plaintiff].") (emphasis in original).  Accordingly, defendants have failed to plead a case of qualification disparity.

That said, defendants *have* asserted another reason that suffices to meet their burden of production.  Defendants assert that "Leonard's assignment to Moulton Elementary was also conceived by the superintendent as part of a larger plan involving the reassignment of several administrators in an effort to save money for the system."[53]  Although defendants make no effort to explain the contours of this alleged plan, they do cite to Rutherford's deposition testimony, in which he elaborates as follows:   Rutherford allegedly had decided that it would be financially advantageous to eliminate the position of transportation and maintenance supervisor in the Lawrence County school system, but felt that the individual who held that position, Harold Pirtle, was someone worth keeping on staff.[54]  For reasons that are

---

[53] Doc. no. 39, Statement of Undisputed Facts, ¶ 35.

[54] *See*, *e.g.*, Rutherford Depo., p. 238, lines 11-15; *id*. at p. 250, lines 1-8.

not clear from the record, Rutherford allegedly decided that Pirtle would be a good fit as principal at Speake School,[55] but that post was occupied by Earl Leonard.[56] When the then-principal of Moulton Elementary retired,[57] Rutherford allegedly came up with the idea of moving Leonard to Moulton Elementary, thus filling that vacancy, and then moving Pirtle to Speake School and eliminating his old position as transportation and maintenance supervisor, which Rutherford claims would have saved the system approximately sixty-five thousand dollars.[58]  Rutherford alluded to this cost-savings scheme — but did not explain it — in a letter he wrote to McElroy on May 19, 2003.[59]

At some point, however, Pirtle decided he would prefer to remain in his transportation and maintenance supervisor position.[60]  Thus, as Rutherford confessed, "[his] original savings [plan] didn't pan out" and was accordingly "abandoned."[61] Assuming McElroy could show that this plan was "abandoned" prior to Rutherford's decision to recommend Leonard for the Moulton principalship, the cost-savings

---

[55] *See, e.g.*, *id*. at p. 238, lines 11-15.

[56] *See id.* at p. 259, lines 8-23; *id*. at p. 262, lines 6-13; *id*. at p. 263, lines 8-19.

[57] *See, e.g.*, *id*. at p. 258, lines 14-23.

[58] *See id.* at p. 259, lines 16-23; *id*. at p. 238, lines 10-17; *id*. at p. 251, lines 7-13.

[59] Rutherford Depo., Ex. 35.

[60] Rutherford Depo., p. 238, lines 18-23; *id*. at p. 250, lines 9-12.

[61] *See* doc. no. 53, Statement of Undisputed Facts, ¶ 35 (quoting Rutherford Depo., pp. 246, 264).

scheme would appear pretextual.  Alas, he cannot make such a showing.  The facts demonstrate that Board of Education voted to hire Leonard as principal of Moulton Elementary on May 20, 2003,[62] and the vacancy announcement for Speake School (which indicated the opening would be filled through an "internal search") was not even posted until two days later, on May 22, 2003.[63]  Rutherford testified that Pirtle "*applied* [for the Speake School position] but *then* backed out."[64]

Accordingly, even drawing all reasonable inferences in McElroy's favor, the evidence indicates that the cost-savings plan did not disintegrate until *after* the Moulton Elementary School vacancy was filled.  As a result, Rutherford's claim that he moved Leonard to Moulton Elementary in order to make room for Pirtle at Speake School is unimpeached, and all of McElroy's claims concerning his nonselection as principal at Moulton Elementary School in 2003 are due to be dismissed.

### ii.    East Lawrence Middle School

The vacancy announcement for the East Lawrence Middle School principalship was posted the same day as the Moulton Elementary School opening, May 5, 2003.[65] Rutherford recommended that the Board of Education place Larry Hancock, a

---

[62] *See* Rutherford Depo., Ex. 39.  *See also id*. at Ex. 37.

[63] Doc. no. 53, Statement of Undisputed Facts, ¶¶ 163, 165.

[64] Rutherford Depo., p. 238, line 21 (emphasis supplied).

[65] Doc. no. 53, Statement of Undisputed Facts, ¶ 148.

Caucasian man, in the principalship — a recommendation that the Board voted to adopt on May 20, 2003.[66]  Defendants have identified no deficiencies in McElroy's application (Rutherford does not even remember seeing that application[67]), focusing instead on the reasons why Hancock was selected.  *Cf. U.S. Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 714 (1983) ("[T]he defendant must produc[e] evidence that the plaintiff was rejected, *or someone else was preferred*, for a legitimate, nondiscriminatory reason.") (internal quotations and citation omitted) (emphasis supplied).  That indirect strategy is permissible so long as the defendants do more than "merely state that the employment decision was based on the hiring of the 'best qualified' applicant." *Steger*, 318 F.3d at 1076.  Instead, defendants "must articulate specific reasons for that applicant's qualifications such as 'seniority, length of service in the same position, personal characteristics, general education, technical training, experience in comparable work or any combination' of such criteria." *Id*. (internal citation omitted).

Rutherford testified that Hancock's experience "set him apart."[68]  As summarized by defendants, "Hancock's previous . . . experience included fifteen

---

[66] *Id*. at ¶ 151; doc. no. 39, Statement of Undisputed Facts, ¶ 36, 38.  *See also* Rutherford Depo., Ex. 39.

[67] Doc. no. 53, Statement of Undisputed Facts, ¶ 152.

[68] Rutherford Depo., p. 254, line 5.

years' service as principal of Hatton High School [immediately prior to taking the East Lawrence Middle School job], [additional work as] principal of East Lawrence Elementary School, and prior service as an assistant principal and teacher."[69]

McElroy does not dispute that Hancock possessed this experience, but still questions its relevance in light of the fact that "[t]he notice of job vacancy for the position did not contain a requirement of administrative experience to hold the job."[70] The court, however, knows of no cases holding that it is improper to hire a candidate who possesses the minimum listed qualifications *plus* considerable experience over one who merely meets the minimum qualifications — and McElroy has not identified any such cases.  Regardless of what the job description for principal (and this particular announcement), stated (or did not state) about administrative experience, there is uncontradicted evidence that Rutherford felt such experience was critical for principal candidates; indeed, he affirmed under oath that "[he has] not recommended candidates for principalships who do not possess relevant administrative experience,"[71] and all of the candidates he hired for principalships while acting as superintendent had some background in school administration.  *Cf. Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 952 (11th Cir. 1991) ("Although

---

[69] Doc. no. 39, Statement of Undisputed Facts, ¶ 37.

[70] Doc. no. 53, Statement of Undisputed Facts, ¶ 150.

[71] Rutherford Aff., ¶ 2.

Honda's expressed preference for existing dealers did not appear in the [dealer selection] manual, . . . . Honda representatives in this corporate region have consistently demonstrated a preference for individuals with whom they are familiar and who have a working knowledge of the company.  Nothing in the Honda manual implies that the factors listed are the only basis on which a decision can be made."); *Smith v. Allstate Insurance Corp.*, 24 F. Supp. 2d 870, 876 (N.D. Ill. 1998) (holding that the failure to list a law degree requirement in a job description does not render a stated preference for candidates with such degrees pretextual).  *See also*, *e.g.*, *Combs v. Plantation Patterns*, 226 F.3d 1519, 1538 (11th Cir. 1997) (holding that superior experience is a legitimate, nondiscriminatory justification for selecting one candidate over another).[72]

---

[72] In other portions of his brief, McElroy makes two related arguments.  First, he notes that there is no official definition of administrative experience in Lawrence County schools, and, hence, Rutherford is left to determine what counts and what does not.  This is true, but "[a]bsent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII or other federal employment discrimination statutes." *Denney v. City of Albany*, 247 F.3d 1172, 1185 (11th Cir. 2001).  Here, McElroy does not make any specific argument that some experience he possessed should have been considered administrative in nature.

Second, McElroy asserts that the Board of Education has previously hired individuals as principals even though they lacked administrative experience.  Again, this is true, but the fact of the matter is all of these hires were made prior to Rutherford's installation as superintendent.  *See* Jeffreys Depo., pp. 97-99; *id*. at pp. 101-104; *id*. at pp. 109-110; Rutherford Depo., pp. 317-323.  In other words, these candidates were recommended by a different superintendent, so any inconsistency in preference for administrative experience is not probative of pretext.  *Cf. Smith*, 24 F. Supp. 2d at 875 ("To demonstrate pretext, [a plaintiff] must focus on the specific decisionmakers at issue.") (citing *Mechnig v. Sears*, *Roebuck & Co.*, 864 F.2d 1359, 1366 (7th Cir. 1988)).

McElroy also wonders, however, who exactly Hancock's experience "set him apart" from, considering Rutherford has no recollection of McElroy's application, did not interview him, and cannot remember any of the other applicants, either.[73] He cites several trial court and appellate decisions from other circuits for the proposition that "[o]ne way to demonstrate pretext is to demonstrate that applicants were never seriously considered for the position in question."[74] *See Lams v. General Waterworks Corp.*, 766 F.2d 386, 391 (8th Cir. 1985); *Buggs v. Powell*, 293 F. Supp. 2d 135, 143 (D.D.C. 2003); *Jindal v. New York State Office of Mental Health*, 728 F. Supp. 1072, 1077 (S.D.N.Y. 1990); *Cooper v. Department of Administration*, 558 F. Supp. 244, 251 (D. Nev. 1982). These cases are inapposite. In each of them, the decisionmaker either admitted, or there was specific proof, that the plaintiff was given perfunctory or no consideration; in an least one case, the plaintiff was not allowed to apply for the position. *See Lams*, 766 F.2d at 393; *Buggs*, 293 F. Supp. 2d at 143; *Jindal*, 728 F. Supp. at 1077; *Cooper*, 558 F. Supp. at 252.

Of course, McElroy was allowed to apply, and there is no evidence that he was not considered. Rutherford simply testified that he did not *remember* anything about McElroy's application. The Eleventh Circuit has intimated that a lack of memory

---

[73] Doc. no. 53, Statement of Undisputed Facts, ¶ 149.

[74] Doc. no. 53, p. 33.

concerning an applicant will not necessarily preclude the assertion of a legitimate rationale for that applicant's rejection, so long as some "clear and reasonably specific" nondiscriminatory basis for the selection of another candidate is presented. *See Vessels v. Atlanta Independent School System*, 408 F.3d 763, 770 (11th Cir. 2005).  Here, Rutherford did manage to recall what he was looking for in a candidate, and also explained his legitimate reasons for recommending the candidate that was finally chosen.  To wit, he felt that Hancock's "administrative experience on both levels [high school and elementary school] helped in the fact that this [was] a middle school [opening]."[75]  *Cf. Combs*, 226 F.3d at 1538 (holding that superior experience is a legitimate, nondiscriminatory rationale for promotion).  Whether Rutherford now remembers McElroy's application or not, it is undisputed that his administrative experience pales in comparison to that of Hancock.  *See*, *e.g.*, *Brooks v. Jefferson County Commission*, 446 F.3d 1160, 1163 (11th Cir. 2006) (holding that, to establish pretext based on qualification disparities, "[a] plaintiff must show that the disparities between the successful applicant's and her own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'") (internal citation omitted)).

---

[75] Rutherford Depo., p. 254, lines 7-10.

Rutherford also articulated an additional legitimate, nondiscriminatory reason for McElroy's nonselection.  When asked about his other reasons for recommending Hancock, Rutherford responded that "there were some financial implications there."[76] Specifically, Rutherford explained that Hancock was qualified to hold the job and held a master's degree, but not a doctorate degree.[77]  At first blush, it may seem odd to recommend a candidate for a position on the ground that they *lack* a degree that another candidate (here, McElroy) *has*, but Rutherford explained that the salary for principals with doctorate degrees is ten-thousand dollars a year higher than the salary for those who hold merely a master's degree.[78]

McElroy offers only a makeweight response:  he points to a portion of Rutherford's deposition in which he admits that "Hancock going to this school at this point in time really didn't play into even the *original* hundred-and-thirty-thousand dollar savings that I referred to."[79]  This is unremarkable testimony.  Rutherford was obviously attempting to draw a simple distinction between a larger cost-savings plan (discussed above), and his more modest attempt to save a small amount of funds by filling the East Lawrence Middle School with a principal who lacked a doctoral

---

[76] *Id*. at p. 253, line 16 - p. 254, line 10.

[77] *See id*.

[78] *See id.  See also id*. at p. 255, line 21 - p. 256, line 6.

[79] *Id*. at p. 255, lines 16-20 (emphasis supplied).

degree. The fact that this was a separate cost-savings measure does not make it any less legitimate a rationale for selecting Hancock.

In short, McElroy has failed to demonstrate that either of Rutherford's justifications are a pretext for discrimination, and all claims relating to the position at East Lawrence Middle School in 2003 are due to be dismissed.

### iii.    East Lawrence High School

The announcement for a principalship opening at East Lawrence High School was posted simultaneously with those mentioned above, on May 5, 2003.[80]  That announcement indicated that the selectee would be drawn from the existing ranks of the Lawrence County school system — in other words, an "internal search" would be conducted.[81]  Although the announcement did not explain the rationale for this limitation, Rutherford testified that "it was [another facet of his] attempt to move some people around and eliminate some administrative positions and so forth."[82] Consistent with that alleged goal, during the initial internal search period Rutherford personally approached at least three school system employees — Johnny Yates, Larry Hancock, and Clyde Goode — and polled them to gauge their interest in the East

---

[80] Doc. no. 53, Statement of Undisputed Facts, ¶ 153.

[81] *Id*. at ¶¶ 154, 155.

[82] *See* Rutherford Depo., p. 245, lines 19-21.  *See also id*. at p. 247, line 1 - p. 248, line 7.

Lawrence High principalship.[83]   Apparently, none were willing to take the job.

Of course, McElroy was a Lawrence County school system employee who applied for the principalship, but Rutherford again had no recollection of his candidacy and did not interview him.[84]   Without attempting to explain this, defendants simply allege that "[the] internal search failed to yield suitably qualified candidates,"[85] so they posted a new announcement on June 10, 2003, this time eliminating the "internal search" limitation.[86]   McElroy reapplied in response to the second posting,[87] but Tommy Whitlow, a Caucasian man from outside the Lawrence County system, was recommended for, and appointed to, the principalship.[88] McElroy claims to have approached Rutherford and asked him whether the position had been filled.   According to McElroy, Rutherford "responded that it was hilarious to receive a letter for that position from McElroy, and that Rutherford had previously interviewed the person who was going to fill the position."[89]

---

[83] *See id.* at lines 1-14.  *See also* doc. no. 39, Statement of Undisputed Facts, ¶ 47.

[84] Doc. no. 53, Statement of Undisputed Facts, ¶¶ 160, 161.  *See also* McElroy Aff., p. 5.

[85] Doc. no. 39, Statement of Undisputed Facts, ¶ 46.

[86] *See* doc. no. 53, Statement of Undisputed Facts, ¶ 156.  Rutherford's testimony may provide an alternative explanation of why the job was reposted:  he testified that the original cost-savings plan "didn't work out[,] so the second posting, we abandoned that idea and just tried to get what we felt like was the best applicant."   Rutherford Depo., p. 246, lines 14-18.

[87] Doc. no. 53, Statement of Undisputed Facts, ¶ 161.  *See also* McElroy Aff., p. 5.

[88] Doc. no. 53, Statement of Undisputed Facts, ¶¶ 158, 159.

[89] *Id.* at ¶ 162.  The court is unsure of the purported meaning of this alleged statement but, in any case, McElroy does not attempt to cite it as direct evidence of discrimination.

In any event, Rutherford again did not testify to his specific reasons for recommending Whitlow.  The most that can be said is this:  the parties agree that "Whitlow had, at the time, served as a principal and as an assistant principal in the Decatur City school system for many years";[90] and, earlier in his deposition, Rutherford stated that "although it wasn't posted [on the announcement], I felt the administrative experience was important."[91]  This provides some degree of insight as to the particular qualifications that Rutherford considered in evaluating the candidates, but still falls short of conveying a clear and specific *reason* why Whitlow was selected or McElroy was not selected.  *See Aikens*, 460 U.S. at 714 ("[T]he defendant must produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.") (internal quotations and citation omitted); *Alexander*, 207 F.3d at 1342 (holding that a jury could reasonably infer intentional racial discrimination where the selecting official "offered *no* reason, let alone a legitimate race-neutral reason, to explain the promotion of McIver and not Fox") (emphasis in original).

Accordingly, defendants have failed to rebut McElroy's apparently undisputed *prima facie* case of discrimination, and this claim survives summary judgment.  *See*,

---

[90] Doc. no. 39, Statement of Undisputed Facts, ¶ 48.

[91] Rutherford Depo., p. 212, lines 1-9.

*e.g., Turnes v. AmSouth Bank*, 36 F.3d 1057, 1061 (11th Cir. 1994) (noting that, "where a plaintiff's prima facie case is established, but the employer *fails* to meet its burden of production, the unrebutted presumption of discrimination stands") (emphasis in original).

### iv.   Speake School

The Speake School principalship vacancy announcement was posted on May 22, 2003.[92]  As discussed above in connection with the Moulton Elementary School vacancy,[93] Rutherford asserts that his initial goal was to implement a cost-savings plan that would result in Harold Pirtle's position as transportation and maintenance supervisor being eliminated, and Pirtle being placed in the Speake School principalship.[94]  Accordingly, the Speake School announcement proclaimed that the slot would be filled through an internal search.[95]  Pirtle applied, but later withdrew his name from consideration; and, as a result, the cost-savings plan was derailed and Rutherford was forced to select a different candidate.[96]

For reasons that are *entirely unclear*, Rutherford settled upon a Caucasian male

---

[92] Doc. no. 53, Statement of Undisputed Facts, ¶ 163.

[93] *See supra* Part Two, § C-1(a)(i).

[94] *See* Rutherford Depo., p. 259, lines 16-23; *id*. at p. 238, lines 10-17; *id*. at p. 251, lines 7-13.

[95] Doc. no. 53, Statement of Undisputed Facts, ¶ 165.

[96] Rutherford Depo., p. 238, lines 18-23; *id*. at p. 250, lines 9-12; *id*. at p. 261, lines 2-6; doc. no. 53, Statement of Undisputed Facts, ¶ 35.

named Gaylon Parker.[97]  Parker was, it seems, qualified for the principalship.  Indeed, immediately prior to his transfer, Parker served as assistant principal at Moulton Middle School, a position he held for four years;[98] and before that, he was a teacher at Speake School for three years.[99]  His bare qualifications aside, however, defendants do not point to any place in Rutherford's deposition where he attempts to enunciate his rationale for selecting Parker over McElroy — who, as noted, *also* met the minimum qualifications listed on the posted vacancy announcement but was not interviewed.[100]

In light of this, McElroy's claims arising out of his nonselection for the Speake School principalship in 2003 survive summary judgment.  *See*, *e.g.*, *Alexander*, 207 F.3d at 1342 (upholding a jury verdict in favor of the plaintiff in a failure to promote case where the selecting official failed to offer any legitimate, nondiscriminatory rationale for his decision); *Turnes*, 36 F.3d at 1061 (explaining that the failure to rebut a *prima facie* case of discrimination necessitates submission of the case to a jury).

---

[97] Doc. no. 53, Statement of Undisputed Facts, at ¶¶ 167, 168; doc. no. 39, Statement of Undisputed Facts, ¶ 39.

[98] Doc. no. 39, Statement of Undisputed Facts, ¶ 41.  *See also* Deposition of Gaylon Parker ("Parker Depo."), p. 12, lines 5-15.

[99] Doc. no. 39, Statement of Undisputed Facts, ¶¶ 40, 41; Parker Depo., p. 12, lines 1-4.

[100] Doc. no. 53, Statement of Undisputed Facts, ¶¶ 161, 166, 169.

### v.    Hatton High School

The Hatton High School principalship vacancy announcement was first posted on May 22, 2003, and stated that an internal search would be conducted.[101]  The position was not filled in response to this posting, and a second vacancy announcement (without the internal search limitation) was issued on June 10, 2003.[102] Rutherford could not recall any concrete reason for the second posting, but speculated that "maybe there was a need to try to expand [the search] a little bit."[103]  Even after posting the reformulated announcement allowing applications from individuals outside the Lawrence County system, however, Rutherford approached several internal candidates and requested that they consider taking the Hatton High principalship.[104]  For one reason or another, these individuals were not interested.[105] McElroy evidently *was* interested, but Rutherford does not remember seeing his application, and certainly did not interview him for the job.[106]

Rutherford eventually recommended (and the Board of Education voted to hire)

---

[101] *Id*. at ¶¶ 170, 171.

[102] *Id*. at ¶ 172.

[103] Rutherford Depo., p. 223, lines 1-7.

[104] *See* doc. no. 39, Statement of Undisputed Facts, ¶ 45; Rutherford Depo., pp. 228-231.

[105] Rutherford Depo., p. 230, lines 13-23.

[106] *Id*. at p. 226, line 20 - p. 227, line 13; doc. no. 53, Statement of Undisputed Facts, ¶ 178.

a Caucasian man, Dewayne Key, for the principalship.[107]  Key was not an employee of the Lawrence County system at the time of his selection,[108] but had previously served for eight years as Lawrence County Superintendent of Education, filled in as principal at Lawrence County High School for seven months, and taught at Hatton High for ten years.[109]  According to defendants, "Key was recommended to the Board based on the superintendent's conclusion that he was the most qualified applicant for the position."[110]

McElroy contends that this statement of Rutherford's rationale is insufficient. The court disagrees.  As already explained:

> A defendant may not merely state that the employment decision was based on the hiring of the "best qualified" applicant, but must articulate specific reasons for that applicant's qualifications such as "seniority, length of service in the same position, personal characteristics, general education, technical training, experience in comparable work or any combination" of such criteria.

*Steger*, 318 F.3d at 1076 (internal citation omitted).   During his deposition, Rutherford explained at least twice that, after reviewing the field of candidates, he felt Key was the most qualified.[111]  McElroy contends that, even so, Rutherford never

---

[107] Doc. no. 53, Statement of Undisputed Facts, ¶ 175

[108] *Id*. at ¶ 176.

[109] Doc. no. 39, Statement of Undisputed Facts, ¶ 43.

[110] *Id*. at ¶ 44.

[111] Rutherford Depo., p. 227, line 22 - p. 228, line 1; *id*. at p. 232, lines 7-11.

stated *why*. That is not entirely accurate.  At one point, McElroy's attorney asked Rutherford a series of questions concerning Key's background.  Although Rutherford admitted that Key had never served on a permanent basis as a principal or assistant principal in any school, he felt that Key's experience as *a superintendent* "was a positive quality."[112]  Although this is somewhat of a close call, the court believes the fact that Rutherford singled out this experience suffices to "frame the factual inquiry with sufficient clarity so that the plaintiff [had] a full and fair ability to demonstrate pretext." *Burdine*, 450 U.S. at 256.  This conclusion is bolstered significantly by the fact that, throughout his deposition and in his affidavit, Rutherford indicated that he places a premium on administrative experience.[113]  *See*, *e.g.*, *Combs*, 226 F.3d at 1538 (holding that an experience imbalance is a legitimate, nondiscriminatory basis for the selection of one candidate over another).

A legitimate, nondiscriminatory reason having been asserted, McElroy must bear the burden of discrediting that justification.  *See*, *e.g.*, *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088, 1090 (11th Cir. 2004).  But McElroy really does not attempt to argue that he is more qualified than Key in terms of *administrative*

---

[112] *Id*. at p. 224, lines 14-23.

[113] *See*, *e.g.*, Rutherford Aff., ¶ 2 ("Although no one qualification is absolute, the most important qualification for a principal position is relevant administrative experience.  Accordingly, I have not recommended candidates for principalships who do not possess relevant administrative experience.").

*experience*, and a review of his background confirms that he cannot "show that the disparities between [Key's prior administrative experience as superintendent of an *entire school system*] and [his] own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen [Key] over [him].'"   *Brooks*, 446 F.3d at 1163 (internal citation omitted)).  *See also*, *e.g.*, *Lee v. GTE Florida*, *Inc.*, 226 F.3d 1249, 1255 (11th Cir. 2000) (applying a very similar test).  McElroy only began teaching several years prior to his application, and never held any administrative position whatsoever at the school where he taught.   Key, in contrast, was the chief executive (*i.e.*, the superintendent of education) for an entire county school system for eight years.  Clearly, a reasonable finder of fact could conclude that Key was more qualified than McElroy, insofar as he had superior administrative experience in an educational environment and, therefore, was the better candidate.

    In sum, McElroy cannot show pretext, and all of his claims regarding the Hatton High principalship in 2003 are due to be dismissed.

### b.    The assistant principalships

    As mentioned above, McElroy alleges that in 2003, he also applied for an unposted assistant principalship at Lawrence County High School, and "attempted to

apply" for another unposted assistant principalship at Hatton High School.[114] Defendants maintain that both vacancies *were* announced through postings, but admit that McElroy was not interviewed or selected.[115]

Defendants do not bother to contest the application element of McElroy's *prima facie* case with respect to either of these positions, although it might have been advantageous for them to have done so. *See, e.g., Burdine*, 450 U.S. at 248 (noting that "the plaintiff has the burden of proving by the *preponderance of the evidence* a prima facie case of discrimination") (emphasis supplied). As it stands, however, the court is left to assume defendants concede that McElroy either applied, or that, due to the informal way in which defendants sought candidates, they had some duty to consider him. *See, e.g., Carmichael v. Birmingham Saw Works*, 738 F.3d 1126, 1133 (11th Cir. 1984) ("[A] plaintiff makes out a prima facie case . . . as long as he establishes that the company had some reason or duty to consider him for the post."). *Cf. Vessels*, 408 F.3d at 768 (noting that, "where an employer does not formally announce a position, but rather uses informal and subjective procedures to identify a candidate, a plaintiff need not show . . . that he applied for the position — only that

---

[114] Doc. no. 1, ¶ 19.

[115] *See* Rutherford Supp. Aff., ¶ 1; *id.* at Ex. A (Vacancy Announcement for Teacher / Assistant Principal at Lawrence County High School); doc. no. 77, Statement of Undisputed Facts, ¶¶ 138, 201-203; Deposition of Dewayne Key ("Key Depo."), p. 22, line 9 - p. 23, line 8.

-44-

the employer had some reason to consider him for the post") (citing *Jones v.
Firestone Tire & Rubber Co.*, 977 F.2d 527, 533 (11th Cir. 1992)); *Smith v. J. Smith
Lanier & Co.*, 352 F.3d 1342, 1345-1346 (11th Cir. 2003) (implying that a plaintiff
might be relieved of the duty to formally apply where it was the employer's "policy
or practice to transfer individuals to vacant positions who had not first specifically
applied for them").

All other elements of the *prima facie* case also having been established, the ball
rolls squarely to defendants' side of the court.  They respond by attempting to assert
legitimate, nondiscriminatory reasons for not selecting McElroy.  Those purported
reasons are discussed below along with the other pertinent facts.

### i.   Lawrence County High School

During the 2002-2003 school year, Ricky Nichols served as principal of
Lawrence County High School.[116]  Nichols, however, "was called to active military
duty in February of 2003."[117]  "When Nichols was called to active duty . . . , his then-
assistant principal, Sharon Whitlow, was required to assume the bulk of his duties,
thereby giving rise to a need for an *interim* assistant principal."[118]  Apparently without
posting an announcement inviting applications for the opening, the Board of

---

[116] Doc. no. 53, Statement of Undisputed Facts, ¶ 127.

[117] *Id.* at ¶ 128.

[118] Doc. no. 39, Statement of Undisputed Facts, ¶ 55 (emphasis supplied).

Education installed Joe Lang, a Caucasian physical education instructor at Hazlewood High School, as interim (or "acting") assistant principal.[119]  This action — the legitimacy of which does not appear to be contested by McElroy — solved the problem for a while; but then, "[w]hile Nichols was still on active duty, . . . Sharon Whitlow . . . retired, creating a [permanent] vacancy in the assistant principal's position."[120]

McElroy claims the Board of Education did not post a job vacancy announcement for this permanent assistant principalship opening.  Defendants dispute this; but regardless, McElroy alleges that he learned of the opening and applied.[121]  Since Nichols was still the titular principal of Lawrence County High, it was his responsibility to conduct interviews for Whitlow's permanent replacement.[122]  Being overseas at the time, Nichols "conducted interviews for the position . . . by written questions sent via e-mail."[123]  According to McElroy, he "provided answers to Ricky Nichols' e-mail interview questions, and provided those to the central office of the

---

[119] *See* doc. no. 53, Statement of Undisputed Facts, ¶¶ 130, 131, 133, 142; doc. no. 77, Statement of Undisputed Facts, ¶ 130.

[120] Doc. no. 39, Statement of Undisputed Facts, ¶ 57.

[121] Doc. no. 53, Statement of Undisputed Facts, ¶¶ 135, 138; doc. no. 77, Statement of Undisputed Facts, ¶¶ 135, 138.

[122] Doc. no. 39, Statement of Undisputed Facts, ¶ 14; doc. no. 53, Statement of Undisputed Facts, ¶¶ 127, 136.

[123] Doc. no. 53, Statement of Undisputed Facts, ¶ 136.

Lawrence County School System for delivery to Mr. Nichols."[124]  Nichols "recalls interviewing three white individuals for the position, but does not recall if he interviewed McElroy."[125]  (Because of lax record-keeping, it is not possible to independently confirm whether McElroy's responses to Nichols's written questions were submitted to Nichols.[126])

Of the candidates that Nichols considered, or remembers considering, he "believes that Joe Lang [the then-interim assistant principal] submitted the most appropriate responses."[127]  What those responses were is not known; indeed, Nichols does not actually remember the precise questions that were asked, other than that they touched on "experience" and "educational philosophy."[128]  He also does not "remember anything in particular about any of the other answers that anybody else gave that would have made [the other applicants] less appropriate [for the assistant principalship] than Mr. Lang."[129]

Nichols did, however, recall receiving favorable reports of Lang from Sharon

_____

[124] *Id*. at ¶ 138.  Nichols affirmed during his deposition that answers were to be provided to an official at Lawrence County High and then transmitted by e-mail to him.  *See* Deposition of Ricky Nichols ("Nichols Depo."), p. 39, lines 2-18.

[125] Doc. no. 53, Statement of Undisputed Facts, ¶ 137.

[126] *See id*. at ¶ 140.

[127] *Id*. at ¶ 139.

[128] Nichols Depo., p. 43, lines 11-18.

[129] *Id*. at p. 44, lines 3-7 (quotation drawn from attorney's question, to which Nichols responded, "I do not, sir").

Whitlow, who was serving as *de facto* principal in Nichols's absence.[130]  Naturally,

Whitlow had been observing Lang as he performed his duties as interim assistant

principal at Lawrence County High, and she reportedly "rated him as excellent."[131]

Nichols testified that Whitlow's positive comments "would have certainly played a

part" in his decision to support hiring Lang as a permanent assistant principal.[132]  In

that same vein, "[i]n making his recommendation, Nichols also weighed the fact that

Lang had already been performing administrative duties at the school."[133]  In contrast,

Nichols testified that he was not sufficiently acquainted with McElroy to have made

any judgment as to McElroy's "practical abilities . . . to serve as assistant

principal."[134]

Rutherford evidently adopted Nichols's recommendation, and the Board of

Education formally appointed Lang to the position on a permanent basis on June 9,

2003.[135] McElroy argues that defendants have not provided sufficiently clear and

specific reasons for the decision to recommend and hire Lang.  His argument is

flawed because  it focuses exclusively on *one* of the reasons presented by Nichols —

---

[130] Doc. no. 39, Statement of Undisputed Facts, ¶ 61.

[131] Nichols Depo., p. 44, lines 18-22.

[132] *Id*.

[133] Doc. no. 39, Statement of Undisputed Facts, ¶ 60.

[134] Nichols Depo., p. 45, line 22 - p. 46, line 2 (quotation drawn from attorney's question, to which Nichols responded, "I do not, sir").

[135] Doc. no. 53, Statement of Undisputed Facts, ¶ 134.

Lang's responses to the interview questions — and completely ignores the other two: namely, Whitlow's endorsement of Lang; and the desire for a seamless transition. These are perfectly legitimate, nondiscriminatory reasons for Lang's selection. *See*, *e.g.*, *Vessels*, 408 F.3d at 770 (concluding that selection of a candidate based on the belief that they could provide a desired "seamless transition" is both legitimate and nondiscriminatory); *Combs v. Plantation Patterns*, 226 F.3d 1519, 1538, 1540 (11th Cir. 1997) (holding that reliance upon the recommendations of a candidate's supervisors is a legitimate, nondiscriminatory justification).

Since these reasons might motivate a reasonable employer, McElroy had a duty to "meet [them] head on and rebut [them]." *Wilson*, 376 F.3d at 1088. He did not even attempt to do so. Thus, defendants are due summary judgment on this claim.

## ii.   Hatton High School

There are many disputed facts regarding the Hatton High School assistant principalship opening in the summer of 2003. One thing, however, is clear: McElroy did not actually submit an application or interview for the job. According to McElroy, this is because he was not made aware of the opening until be obtained a job announcement during the course of this litigation.[136] This is in spite of the fact that he allegedly was in the habit of "review[ing] on a daily basis the bulletin board

---

[136] *See* doc. no. 53, Statement of Undisputed Facts, ¶¶ 201-203.

at his school where such notices are posted," and also the "bulletin board at the central office."[137]   Defendants assert that the announcement was posted and — surprisingly — that "plaintiff was considered for the position."[138]   The only citation they provide in support of these twin claims, however, relates to another vacancy that existed at a different time at *Hazlewood* High School.[139]

After surveying the evidence, it appears that McElroy was not considered for the Hatton High assistant principalship.   This conclusion is reinforced by the deposition testimony of Dewayne Key, who served as principal of Hatton High at the time.   Key testified that he learned just before taking the job that the assistant principal at Hatton High, Vicki Counts — who also taught science — was going to retire.[140]   Key also saw, or was aware of, a vacancy announcement for an opening as "assistant principal / science teacher" at Hatton High at some point soon after he began working there, but was eventually told that the opening was not going to be filled.[141]   Nevertheless, Key felt that he needed some administrative assistance, so he

---

[137] *Id*. at ¶¶ 202, 203.

[138] Doc. no. 77, Statement of Undisputed Facts, ¶ 201.  *See also id*. at ¶¶ 202, 203.

[139] *See id*. at ¶¶ 201-203.

[140] Key Depo., p. 20, line 15 - p. 21, line 7.

[141] *Id*. at p. 23, lines 1-23.  *See also* Rutherford Depo., p. 205, lines 8-20 (expressing tepid agreement that there was an official decision to not fill the position advertised in the announcement, at least initially).

approached Rutherford and broached the issue.[142]  As he recalls the conversation,
Rutherford responded by telling him there was no vacant position to be filled at
Hatton High, so, if anyone were to assume administrative duties, it would necessarily
have to be an existing Hatton High employee.[143]  Rutherford reiterated this account
during his own deposition, discussing at length the issues surrounding teacher
funding at the time.[144]

The accuracy of Rutherford's conclusion that an assistant principal needed to
be drawn from Hatton High's existing employees is contested, and will be discussed
in detail below.  But regardless of whether Rutherford was correct or incorrect, this
belief functioned to preclude consideration of McElroy, who worked at Speake
School, not Hatton High.  For example, Key testified that upon being told the
assistant principal would have to be an existing Hatton High employee, he "inquired
about people *on staff* who would be administration certified."[145]  Rutherford allegedly
suggested Marion Chamness, who was an agricultural science teacher at Hatton High,
but no one else that Key recalls.[146]  Key suggested a Caucasian man named Brent

---

[142] Key Depo., p. 25, line 8 - p. 26, line 8; doc. no. 39, Statement of Undisputed Facts, ¶ 63.

[143] *See* Key Depo., p. 28, lines 12-23.

[144] *See*, *e.g.*, Rutherford Depo., p. 200, lines 2-23.

[145] Key Depo., p. 29, lines 4-6 (emphasis supplied).

[146] *Id*. at lines 6-13.

Gillespie, who also was a science teacher at Hatton High.[147]  At the same time, Key disclosed the problem with Gillespie, stating, "I know he is not administrative certified [*sic*], but he probably could do the work."[148]  Rutherford was reportedly "not . . . real enthusiastic about the notion simply because Mr. Gillespie had not at that time completed his administrative certification," and Board policies require that assistant principals possess such certification as a prerequisite to employment.[149] Key, however, was not dissuaded, telling Rutherford:  "I'm not worried about . . . whether he is either certified or not, I just want somebody who can do the work."[150]

In the end, Key got his way:  Rutherford evidently recommended Gillespie for the assistant principalship, and the Board of Education recognized him as assistant principal and science teacher,[151] despite the fact that he was not certified to serve as an administrator in Alabama public schools at the time.[152]  Rutherford testified that, to his knowledge, there was no discussion of McElroy in connection with this

---

[147] *Id*. at lines 13-21; Rutherford Depo., p. 206, lines 3-7.  *See also* doc. no. 39, Statement of Undisputed Facts, ¶ 64; doc. no. 53, Statement of Undisputed Facts, ¶ 185.

[148] Key Depo., p. 29, lines 17-21.

[149] *Id*. at line 23 - p. 30, line 8; doc. no. 53, Statement of Undisputed Facts, ¶¶ 231-232.

[150] Key Depo., p. 30, lines 11-15.

[151] Doc. no. 53, Statement of Undisputed Facts, ¶ 187; doc. no. 39, Statement of Undisputed Facts, ¶ 62.

[152] Doc. no. 53, Statement of Undisputed Facts, ¶ 186; doc. no. 39, Statement of Undisputed Facts, ¶ 67.  Gillespie has since received administrative certification.  *See* doc. no. 39, Statement of Undisputed Facts, ¶ 67.

position, though he did express *post hoc* doubts as to McElroy's viability, given that McElroy was not certified to teach science.[153]   Of course, failure to meet a certification requirement obviously did not negatively affect Gillespie's candidacy. *Cf. Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir. 1998) (noting that suspicion arises where "it is alleged that established rules were bent or broken to give a non-minority applicant an edge in the hiring process").

Indeed, the more substantial reason offered by defendants for not considering or hiring McElroy is financial.  As discussed above, defendants claim they had little choice but to hire an existing Hatton High employee due to funding limitations.  The parties agree that "[t]here are two potential sources of funding for teacher salaries: funds from the Alabama State Department of Education Foundation Program; and, funds from revenue sources available to local school systems, such as taxes."[154]  Both types of funds are often measured in terms of "units" — *i.e.*, "the amount of money required to pay for one teacher or administrator in the Alabama public schools."[155] Rutherford testified that, due to "state cutbacks and declining enrollment at Hatton

---

[153] Rutherford Depo., p. 208, lines 8-14.  *See also* doc. no. 89 (Plaintiff's Supplemental Brief in Opposition to Summary Judgment), p. 9.

[154] Doc. no. 53, Statement of Undisputed Facts, ¶ 190.

[155] Affidavit of Dr. William Hanebuth ("Hanebuth Aff."), p. 2.  Defendants quibble with this phraseology, but do not provide a record citation supporting any alternative definition or clarification of this definition.  *See* doc. no. 77, Statement of Undisputed Facts, ¶ 189.

High School and loss of locally-funded units," Hatton High and other Lawrence County schools had a diminished financial capacity to employ teachers and administrators.[156]   Actually, Rutherford vacillated on the issue of whether the financial troubles were due to a loss of local units or state units;[157] but, on the whole, he claimed that Hatton High's "staff was reduced" and "[t]here was no [available] unit there," so the only way to designate a new assistant principal would be to utilize an existing teacher.[158]

McElroy assails this justification as pretextual.  He points to a 2003-2004 Local Education Agency Personnel ("LEAP") report that was submitted by the Lawrence County Board of Education to the State of Alabama; the LEAP report indicates that the Board of Education used local funds to pay Gillespie a supplement of $2,981.64.[159]  This figure is only forty-six cents shy of the $2,982.00 supplement that the Board's salary schedule indicates assistant principals must receive.[160] McElroy cites this as evidence that the Board could, in fact, afford to fund an assistant principal position.

---

[156] Rutherford Depo., p. 202, lines 1-22.

[157] *Compare id*. at p. 200, lines 2-5 *with id*. at p. 203, line 14 - p. 204, line 15.

[158] *Id*. at p. 200, line 18; *id*. at p. 199, lines 12-13. *See also* Jeffreys Depo., p. 201, lines 6-23.

[159] *See* Hanebuth Aff., pp. 1-2; *id*. at Ex. B.  *See also* doc. no. 53, Statement of Undisputed Facts, ¶¶ 195, 200.

[160] Doc. no. 53, Statement of Undisputed Facts, ¶ 198.

What this argument ignores, however, is that supplements "[a]re not positions."[161]   Indeed, Rutherford testified that "[a] supplement is interpreted as something [paid for work performed during] after school hours.  So that would be extracurricular activities.  Ball games, maybe PTO meetings or something like that."[162]   He further explained that, in some Lawrence County schools, "assistant principal[s] get that supplement for the after-school things . . . [but the] system doesn't allocate a unit . . . for an assistant principal," and that person teaches a full load and is paid as a teacher.[163]   Still, the individual is "recognized by the system" as an assistant principal.[164]

Presumably, this is what defendants contend occurred with respect to Gillespie, and some evidence supports that contention.  The two LEAP reports in evidence show, for instance, that Gillespie's actual state-funded salary ($39,000.00 annually) did not change after he was designated assistant principal.[165]   Instead, as Rutherford explained, Gillespie just earned the additional "supplement for extracurricular activities."[166]   On the other hand, the LEAP reports — as interpreted by Dr. William

---

[161] Rutherford Depo., p. 64, line 9.

[162] *Id*. at p. 66, lines 7-12.

[163] *Id*. at p. 65, lines 2-10.

[164] *Id*. at lines 11-13.

[165] *Compare* Hanebuth Aff., Ex. A *with id*. at Ex. B.

[166] Rutherford Depo., p. 199, lines 1-14.

Hanebuth, Manager of Research for the Alabama Education Association — appear to directly contradict Rutherford's assertion that Hatton High School lost any state-funded units between 2003 and 2004.[167]  According to Hanebuth, the LEAP reports indicate the Board of Education received the same number of state-funded units for Hatton High School teachers and administrators for the 2002-2003 school year and the 2003-2004 school year:  *i.e.*, twenty.[168]  In contrast, Rutherford claimed that Hatton High was "down to eighteen teaching units" for the 2003-2004 school year.[169]  The court's own review of the LEAP reports confirms that they appear to indicate (as McElroy's expert witness asserts) at least twenty state-funded teaching units for both of the time periods at issue.

This conflicting evidence creates a fact dispute regarding the veracity of Rutherford's asserted justification for not considering McElroy that simply cannot be resolved on a motion for summary judgment.  Add to that the fact that Gillespie was hired despite his lack of administrative certification, and McElroy has successfully carried his pretext burden.  *See Walker v. Prudential Property & Casualty Insurance Co.*, 286 F.3d 1270, 1279 (11th Cir. 2002) ("The bending of established rules may, of course, be suggestive of discrimination."); *Carter*, 132 F.3d at 644 ("Certainly, it

---

[167] *See* Hanebuth Aff., pp. 1-2; *id*. at Ex. A; *id*. at Ex. B.

[168] *See* Hanebuth Aff., p. 2.

[169] Rutherford Depo., p. 202, lines 1-7.  *See also id*. at p. 200, lines 2-23.

is even more suspicious where it is alleged that established rules were bent or broken to give a non-minority applicant an edge in the hiring process."). *See also Bass v. Board of County Commissioners*, 356 F.3d 1095, 1108 (11th Cir. 2001) ("Here, the fact that the Division promoted Preston, an employee who was unqualified under the Division's criteria, over Bass supports an inference of discrimination."). Accordingly, defendants' motion is due to be denied insofar as it seeks dismissal of the claims related to the Hatton High assistant principalship opening in 2003.

## 2.    Round two:  June - July 2004

After failing to obtain a promotion to either principal or assistant principal during the previous spring and summer, McElroy filed a charge of discrimination with the EEOC on October 23, 2003.[170]  Approximately seven months later, on May 28, 2004, he received a "Dismissal and Notice of Rights" letter.[171]  In the months during which McElroy's charge was pending, no principalship or assistant principalship openings were posted.[172]  The first openings announced subsequent to McElroy's filing of his EEOC charge were at Hazlewood High School in June 2004, and at Speake School in July 2004.[173]  McElroy submitted applications for both

---

[170] Doc. no. 53, Statement of Undisputed Facts, ¶ 261.

[171] *Id*. at ¶ 262.

[172] *See id*. at ¶ 263.

[173] *Id*. at ¶¶ 263, 204, 212.

positions, but was twice rejected.[174]  He asserts claims of racial discrimination and

retaliation in connection with each of these rejections.

>    a.    **Hazlewood High School**

The Lawrence County Board of Education posted a vacancy announcement for

the position of principal at Hazlewood High School on June 9, 2004.[175]  Under the

heading "required qualifications," the announcement listed a "minimum of three years

experience in an administrative position."[176]  All parties agree that this was the first

announcement to contain such a requirement and, further, that the Board's official job

description for the position of principal in the Lawrence County school system does

not mandate administrative experience.[177]   Whatever the genesis of this new

requirement, it significantly limited the number of competitive candidates: while five

individuals applied (two African Americans and three Caucasians), only one of the

applicants possessed at least three years of administrative experience.[178]  Accordingly,

Rutherford chose to interview only that person, a Caucasian male named Benny

Burns, who previously had served as an assistant principal at both Speake School and

---

[174] *Id*. at ¶¶ 209, 211, 216, 226.

[175] *Id*. at ¶ 204.

[176] *Id*. at ¶ 205; McElroy Aff., Ex. 13.

[177] Doc. no. 53, Statement of Undisputed Facts, ¶¶ 205, 206.

[178] *Id*. at ¶¶ 209, 210; Rutherford Depo., p. 189, lines 2-6.

East Lawrence High School.[179]   Burns was eventually recommended for the principalship by Rutherford, and hired by the Board of Education.[180]

Even assuming *arguendo* that McElroy could establish a *prima facie* case of both racial discrimination and retaliation on these facts, the court concludes that defendants have produced a legitimate, nondiscriminatory reason for their action — *i.e.*, McElroy's lack of administrative experience — and McElroy has failed to rebut that reason.  McElroy argues that defendants' asserted justification is pretextual for three reasons:  (*i*) this was the first time administrative experience was a *listed* requirement on an announcement for a principal position; (*ii*) the Board of Education does not have any standardized, written definition of administrative experience; and (*iii*) Rutherford testified that he alone determines whether a given candidate possesses such experience in the course of evaluating that candidate.[181]

As to the first argument, the court sees nothing irregular about the addition of an experience requirement to the vacancy announcement.  There is evidence indicating that Rutherford had been giving serious consideration to administrative experience prior to this time, and it is obvious that such experience is a legitimate

[179] Doc. no. 53, Statement of Undisputed Facts, ¶¶ 210, 211; doc. no. 39, Statement of Undisputed Facts, ¶ 51; Rutherford Depo., p. 189, lines 2-6.

[180] Doc. no. 53, Statement of Undisputed Facts, ¶ 211.

[181] *Id*. at ¶¶ 207, 208; Rutherford Depo., p. 225, line 1 - p. 226, line 13.

factor to consider.  *Cf. Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 764 (7th Cir. 2001) ("We are not convinced that a requirement that an assistant warehouse manager have warehouse experience shows discriminatory intent, even if the job description had recently been changed.").  *See generally Combs v. Plantation Patterns*, 226 F.3d 1519, 1538 (11th Cir. 1997) (holding that superior experience is a legitimate, nondiscriminatory rationale).

With respect to the second and third arguments concerning the absence of any concrete definition of administrative experience, the court has already rejected them in connection with the 2003 opening at East Lawrence Middle School.[182]  To briefly recapitulate, McElroy has produced no evidence whatsoever that Rutherford used his interpretative prerogative so as to manipulate the definition of administrative experience in a suspicious manner.  *See Denney v. City of Albany*, 247 F.3d 1172, 1185 (11th Cir. 2001) ("Absent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII or other federal employment discrimination statutes.").  Indeed, it seems beyond dispute that Burns had relevant administrative experience of the same type that Rutherford had exhibited preference for in the past:  he had served as an assistant

---

[182] *See supra* Part Two, § C-1(a)(ii).

principal at two different schools in Lawrence County. McElroy, on the other hand, spent much of his life working outside the context of county schools, and has never served as an administrator in a public school. Perhaps recognizing this, McElroy does not make any specific argument that some experience he possessed should have been considered administrative in nature.

McElroy's inability to demonstrate that defendants' proffered legitimate, nondiscriminatory reasons are pretextual in itself defeats both his racial discrimination and retaliation claims. *See*, *e.g.*, *Hurlbert v. St. Mary's Health Care System*, *Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) (noting that the *McDonnell Douglas* burden shifting analysis applies to retaliation claims under Title VII); *Riley v. Birmingham Board of Education*, 154 Fed. Appx. 114, 117 (11th Cir. 2005) ("Again, we need not decide whether Riley has established a prima facie case because we conclude that he has failed to establish that there is a genuine issue of material fact that each of the Board's asserted reasons for Riley's non-hiring was a pretext[.]"). Accordingly, defendants' motion for summary judgment is due to be granted insofar as it pertains to the claims arising out of this opening.

### b.    Speake School

On June 28, 2004, the Board of Education posted a notice of job vacancy for

the position of assistant principal / teacher at Speake School.[183]   (The assistant principalship was a half-time position; the person selected would also be obliged to perform teaching duties.[184])   Under the "required qualifications" field of the announcement, the following prerequisites were listed:  "Minimum Master's Degree. Certified to teach secondary special education or math in [the] schools of Alabama."[185]   As discussed previously, all assistant principals also must hold "appropriate [administrative] certification" to serve as an assistant principal, and that requirement is routinely included on vacancy announcements.[186]   As Rutherford admitted, this certification requirement *should* have, but did *not*, appear on the posted announcement.[187]

In any event, McElory possessed the requisite certification in administration, was certified to teach special education in Alabama public schools, and applied in response to the announcement.[188]   Three other individuals also applied, one of whom was a Caucasian male named Heath Grimes.[189]   Interestingly, Grimes taught special

---

[183] Doc. no. 53, Statement of Undisputed Facts, ¶ 212.

[184] Doc. no. 39, Statement of Undisputed Facts,¶ 70.

[185] Rutherford Depo., Ex. 16.

[186] Doc. no. 53, Statement of Undisputed Facts, ¶ 213.  *See also generally id*. at ¶ 215.

[187] *Id*. at ¶ 214.

[188] *Id*. at ¶¶ 123, 216; McElroy Aff., Ex. 1.

[189] Doc. no. 53, Statement of Undisputed Facts, ¶ 216.  *See also id*. at ¶ 227.

education at Speake School at the time, and another Caucasian candidate, Tina Blankenship, taught math at the same school.[190]  It turns out that both Grimes and Blankenship had expressed interest in the assistantship to the principal, Gaylon Parker, *prior* to the job becoming available or the announcement being posted.[191] Parker allegedly made no commitments to either Grimes or Blankenship, telling them both simply that "[they] would have to interview and go through the process, but [he also] encouraged them to apply."[192]  When asked whether it was mere fortuity that the later-formulated announcement specifically called for certification in either math or special education — the two subjects that these would-be candidates taught — Parker was quite candid, stating: "No; it's not coincidence."[193]  Indeed, Parker had informed the personnel office ahead of time that he "had two people there [at Speake School] that would be candidates."[194]  Presumably as a result of this communication, in addition to requiring certification in either math or special education, the announcement indicated that an "internal search" would be performed.[195]

---

[190] Parker Depo., p. 48, lines 5-15.

[191] *Id*. at p. 47, line 17 - p. 48, line 4.

[192] *Id*. at p. 48, lines 1-4.

[193] *Id*. at p. 50, lines 6-11.

[194] *Id*. at lines 12-16.

[195] *See id*. at p. 24, line 9; Rutherford Depo., Ex. 16.

Parker interviewed Grimes, Blankenship, and McElroy for the job.[196]  Each of the candidates was asked to respond to a standard set of questions, though Parker could not recall any specific questions and had, at most, only a vague recollection of the candidates' answers.[197]   Parker eventually chose to endorse Grimes, and Rutherford adopted his recommendation and forwarded it to the Board of Education, which voted to approve it.[198]

McElroy argues that this decision was motivated by racial and/or retaliatory animus.  As to the failure to promote claim, defendants have evidently chosen to not make an issue of McElroy's *prima facie* case, and the court detects no deficiencies in that regard, either:  McElroy is a member of a protected group; was qualified and applied for the position; but was rejected in favor of a Caucasian applicant. *See*, *e.g.*, *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 768 (11th Cir. 2005). Defendants do charge, however, that McElroy cannot establish the *prima facie* elements of a retaliation cause of action.  Thus, before reaching the second and third steps of the *McDonnell Douglas* inquiry, the court will address that contention.

As discussed previously, a *prima facie* case of retaliation requires three elements:  (1) participation in statutorily protected activity; (2) adverse employment

---

[196] Doc. no. 53, Statement of Undisputed Facts, ¶ 217.

[197] Parker Depo., p. 29, lines 6-22.

[198] Doc. no. 53, Statement of Undisputed Facts, ¶¶ 224-226.

action; and (3) a causal linkage between the plaintiff's participation in protected activity and the employer's decision to take adverse action.  *See Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998).  In the absence of any more probative evidence, many plaintiffs resort to suggestive timing to establish the causation element.  *See*, *e.g.*, *Brungart v. BellSouth Telecommunications*, *Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection").  *See also Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001) (same).  But the Supreme Court has indicated that to be sufficient standing alone, the temporal gap must be "'very close.'"  *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001) (quoting *O'Neal v. Ferguson Construction Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)).[199]

_____

[199] In full text, the Supreme Court's statement in *Breeden* concerning temporal proximity is as follows:

> The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close," *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (C.A.10 2001).  *See e.g., Richmond v. ONEOK*, *Inc.*, 120 F.3d 205, 209 (C.A.10 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A.7 1992) (4-month period insufficient).  Action taken (as here) 20 months later

In the present case, McElroy's EEOC charge was filed on October 23, 2003.[200] Grimes was not hired by the Board of Education until July 13, 2004, nearly nine months later.[201]  Stated simply, nine months is too long a time span between notice of protected activity and adverse action to permit a reasonable inference of causation. *See*, *e.g.*, *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("We are not persuaded that *three months* . . . is sufficiently proximate to show causation.") (emphasis supplied).  McElroy disagrees, arguing that the court should judge proximity by measuring the time that passed between the *conclusion* of EEOC proceedings and the adverse action.  In his case, the EEOC issued a "Dismissal and Notice of Rights" letter on May 28, 2004.[202]  Accordingly, McElroy claims the court is confronting a mere two month gap.  This is an untenable contention.

The cases that confront this issue make clear that the temporal connection must be measured from the date the alleged discriminating official *first* became aware of the protected activity — not from the date of any event that might have *reminded* them of the activity.  *See*, *e.g.*, *Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d

---

suggests, by itself, no causality at all.

*Breeden*, 532 U.S. at 273-74.

[200] Doc. no. 53, Statement of Undisputed Facts, ¶ 261.

[201] *Id*. at ¶ 226.

[202] *Id*. at ¶ 262.

1322, 1337 (11th Cir. 1999) (requiring a plaintiff to provide "sufficient evidence that the decision-maker *became aware* of the protected conduct, and that there was close temporal proximity between *this awareness* and the adverse employment action") (emphasis supplied); *Vandesande v. Miami-Dade County*, 431 F. Supp. 2d 1245, 1257 (S.D. Fla. 2006) ("In light of the possibility that the supervisor's awareness may not be contemporaneous with the protected activity, it is the [date of the] supervisor's awareness that is relevant [not just the date of the activity]."); *Gibbs v. City of New York*, No. 02-CV-2424-LB, 2005 WL 497796, at * 11 (S.D.N.Y. January 21, 2005) ("In analyzing causation, the Court considers when defendant *first became aware* of plaintiff's protected activity.") (emphasis supplied) (citing *Breeden*, 532 U.S. at 273).

Indeed, in *Breeden*, the Supreme Court, albeit in *dictum*, agreed that an argument in favor of starting the clock on the date that the EEOC issued a right to sue letter was an "utterly implausible suggestion." *See Breeden*, 532 U.S. at 273. *Dictum* or not, this court is persuaded, and will follow the Supreme Court's lead.

Finally, McElroy argues that he has presented more evidence of causation than mere suspicious timing. *See Brungart*, 213 F.3d at 799 (noting that "a plaintiff need only show [through whatever means possible] that the protected activity and the adverse action were not wholly unrelated"). *See also*, *e.g.*, *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) ("If there is a substantial delay between the

-67-

protected expression and the adverse action[,] *in the absence of other evidence tending to show causation*, the complaint of retaliation fails as a matter of law.") (emphasis supplied).   His only alternative theory, however, is that the job announcement for Speake School was "manipulated" to allow Grimes to apply despite his lack of administrative certification.  Of course, this argument does little more than beg the question.  And there are other problems as well:  it is not exactly a short jump from the conclusion that the announcement was manipulated to allow Grimes to apply, on the one hand, to the conclusion that allowing Grimes to apply was intended to exclude McElroy from the job, on the other.   Indeed, the announcement, as formulated, perfectly aligns with *McElroy's* own credentials.  Given that, it would be unreasonable — or at the very least, counterintuitive — to draw an inference that any changes to the job requirements were specifically intended to isolate McElroy from the position.  *Cf. Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) ("[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation.").  It is also worth mentioning that Parker, not Rutherford, was charged with initially recommending an individual for this post, and there is no evidence that Parker had any reason to retaliate against McElroy.  Accordingly, McElroy has failed to establish a *prima facie* case of retaliation, and summary judgment is due to be

entered in favor of defendants on that claim.

Having so held, it remains to address the second and third steps of the *McDonnell Douglas* analysis insofar as it pertains to McElroy's failure to promote claims. When asked why he selected Grimes over McElroy, Parker mentioned essentially three factors. First, he stated that "the interview was one tool in [the] decision."[203] As he remembers it, McElroy provided a particularly abbreviated answer to a question about disciplinary philosophy (allegedly stating that "he didn't have disciplinary problems"[204]), whereas Grimes "answered [some questions] more extensively."[205] McElroy disputes that his answers were abbreviated, and argues that he provided a very developed discussion of his philosophy and background.[206] More generally, he attacks this reason since Parker also testified that McElroy's interview went well, and that McElroy did not do or say anything during the interview to cause him not to be recommended for the position.[207]

Second, Parker asserts that he based his decision in part on the fact that he had personally observed Grimes and had knowledge of his administrative capabilities,

---

[203] Parker Depo., p. 31, lines 8-13. *See also* doc. no. 53, Statement of Undisputed Facts, ¶ 221.

[204] Doc. no. 53, Statement of Undisputed Facts, ¶ 222.

[205] Parker Depo., p. 31, lines 8-9.

[206] Doc. no. 53, Statement of Undisputed Facts, ¶ 223.

[207] *Id*. at ¶ 218.

-69-

whereas he was not well-informed as to McElroy's abilities in this regard.[208]

Third and finally, Parker at one point implied that he had a less favorable opinion of McElroy because he had taken a college course with him and did not believe he interacted well with others.[209]  McElroy questions the truthfulness of this testimony, noting that just a few pages earlier, Parker testified very clearly that nothing he knew of McElroy from the college course was a "pro or con" for him in terms of his candidacy for the assistant principalship.[210]

All of the factors set forth above appear to be legitimate, nondiscriminatory reasons, but they also are uniformly subjective.  Now, "an employer's use of subjective factors in making a hiring or promotion decision does not raise a red flag.  Certainly nothing in our precedent establishes that an employer's reliance upon legitimate, job-related subjective considerations suggests *in its own right* an intent to facilitate discrimination."  *Denney v. City of Albany*, 247 F.3d 1172, 1186 (11th Cir. 2001) (emphasis supplied).  Here, though, there is more.

McElroy has pointed out inconsistencies in Parker's testimony relative to two of the three reasons he offered.  While he said at one point that McElroy provided an abbreviated response to a question, at another point he conceded that McElroy did

---

[208] Parker Depo., p. 38, line 11 - p. 39, line 2; *id*. at p. 45, lines 12-17.

[209] *Id*. at p. 46, line 21 - p. 47, line 13.

[210] *Id*. at p. 33, lines 4-12.

nothing during the interview to damage his candidacy.  Similarly, although Parker

suggested for a moment that he had an unfavorable impression of McElroy from a

college class that he took with him, he also stated, without discernable equivocation,

that nothing he remembers from McElroy's behavior during that class was a "pro or

con."[211]  In other words, through his own testimony, Parker has created genuine issues

of material fact as to the truthfulness of his asserted reasons.

McElroy did not significantly discredit any portion of Parker's testimony

concerning his personal knowledge of Grimes's administrative abilities.  Even so,

there is "additional circumstantial evidence that does not neatly fall into the

*McDonnell Douglas* framework [but] that . . . is relevant to the issue of pretext."

*Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir. 1998).

Parker admitted that, at the time he interviewed Grimes, he knew that Grimes lacked

administrative certification and had not yet completed the course of study necessary

to earn a master's degree.[212]  Indeed, another Board of Education official confirmed

that when Grimes was hired on July 13, 2004, there was no record on file indicating

that he possessed a master's degree, and he did not obtain administrative certification

---

[211] *Id.*

[212] *Id.* at p. 39, lines 3-9.

until November 24, 2004.[213]  While administrative certification was not listed on the

announcement, all parties appear to agree that it was a requirement for assistant

principals, and the announcement itself made clear that a master's degree was a

necessity.[214]

As already noted, the law of this Circuit is clear that "the bending of

established rules may . . . be suggestive of discrimination."  *Walker v. Prudential*

*Property & Casualty Insurance Co.*, 286 F.3d 1270, 1279 (11th Cir. 2002).  *See also*,

*e.g.*, *Bass v. Board of County Commissioners*, 356 F.3d 1095, 1108 (11th Cir. 2001)

("Here, the fact that the Division promoted Preston, an employee who was

unqualified under the Division's criteria, over Bass supports an inference of

discrimination."); *Carter*, 132 F.3d at 644 ("Certainly, it is even more suspicious

where it is alleged that established rules were bent or broken to give a non-minority

applicant an edge in the hiring process.").  That, of course, is exactly the implication

here, since McElroy, unlike Grimes, possessed all necessary credentials.

Accordingly, the court holds that there is sufficient evidence of pretext to allow

---

[213] *See* Jeffreys Depo., p. 169, line 22 - p. 172, line 10.  When issued in November 2004, the
administrative certificate was, in accordance with standard protocol, deemed effective July 1, 2004,
but it is impossible to tell whether the decisionmakers knew that Grimes would obtain retroactive
certification, and there is no evidence that his promotion was conditioned upon doing so.  *See id.* at
Ex. 93.

[214] *See*, *e.g.*, Rutherford Depo., Ex. 16.

McElroy's claims arising out of his rejection for the Speake School assistant principalship in 2004 to reach a jury.

## PART THREE

*Proper Defendants to Title VII Claims and Defenses Under 42 U.S.C. § 1983*

The upshot of Part Two is that McElroy's retaliation claims must be dismissed, as must *all* claims arising out of five vacancies:  Lawrence County High School assistant principal (2003); Hatton High School principal (2003); Moulton Elementary School principal (2003); East Lawrence Middle School principal (2003); and Hazlewood High School principal (2004).  At this point, McElroy's failure to promote claims arising out of the following four vacancies remain a part of the case: East Lawrence High School principal (2003); Speake School principal (2003); Hatton High School assistant principal (2003); and Speake School assistant principal (2004).

As discussed above, McElroy bases these failure to promote claims upon three distinct sources of law — Title VII, 42 U.S.C. § 1981, and the Equal Protection Clause of the Fourteenth Amendment.  The court explained earlier in this opinion that both the Equal Protection claim and the § 1981 claim are properly articulated through the remedial vehicle that is found in yet another statute, 42 U.S.C. § 1983.  Several idiosyncracies of Title VII and § 1983 claims must now be addressed.

## A.    Concessions and Other General Matters

"Individual capacity suits under Title VII are . . . inappropriate." *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991).  *Cf. Hinson v. Clinch County*, 231 F.3d 821, 827 (11th Cir. 2000) (holding that the members of a school board could not be held individually liable for employment discrimination against a high school principal).  Recognizing this — and for other reasons as well — McElroy consents to dismissal of all individual capacity claims against the members of the Lawrence County Board of Education, regardless of whether they were asserted under Title VII, § 1981, or otherwise through § 1983.[215]  Again recognizing the impropriety of individual capacity suits under Title VII, McElroy consents to dismissal of his Title VII individual capacity claims against Superintendent Dexter Rutherford.[216]

Additionally, although McElroy does not address it, the court notes that he has asserted both official capacity claims against the Board members and Rutherford, but has separately named the Board of Education as a defendant.  As the Supreme Court has explained:

> Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent.  As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.  It is *not* a suit against the official personally, for the real party in interest is the entity.

---

[215] Doc. no. 53, p. 57.

[216] *See id.*

*Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (emphasis in original) (internal

quotations and citations omitted).

In other words, "[c]laims against officers in their official capacity are

'functionally equivalent' to claims against the entity that they represent." *Godby v.*

*Montgomery County Board of Education*, 996 F. Supp. 1390, 1403 (M.D. Ala. 1998)

(dismissing individual capacity § 1983 claims against board members where the

board itself was also sued) (quoting *Busby v. City of Orlando*, 931 F.2d 764, 776

(11th Cir. 1991)). *See also Walton ex rel. R.W. v. Montgomery County Board of*

*Education*, 371 F. Supp. 2d 1318, 1324 (M.D. Ala. 2005) (dismissing official capacity

claims against school superintendent and board of education members because such

claims "are redundant of the claims against the Board"); *Garrett v. Clarke County*

*Board of Education*, 857 F. Supp. 949, 952 (S.D. Ala. 1994) ("In the case *sub judice*,

the plaintiff has sued the Board directly, so all of the § 1983 claims against the

Superintendents in their official capacities are due to be dismissed with prejudice.");

*Rubio v. Turner Unified School District No. 202*, 453 F. Supp. 2d 1295, 1300 (D.

Kan. 2006) (dismissing official capacity claims against superintendent and individual

board members "because they duplicate the claims against the District").

Accordingly, McElroy's official capacity claims against the Superintendent and

the members of the Lawrence County Board of Education will be dismissed

summarily, and his individual capacity claims against the Board members also will be dismissed.

In summary, the claims that remain are McElroy's § 1983 and Title VII claims against the Board of Education as an entity, and his individual capacity § 1983 claim against Rutherford.  Those claims are discussed below.

**B.    Board of Education Liability**

The Lawrence County Board of Education is a branch of local government.  As such, it is potentially liable for constitutional violations and breaches of federal law pursuant to 42 U.S.C. § 1983.  *See*, *e.g.*, *Denno v. School Board of Volusia County*, 218 F.3d 1267, 1276 & n.9 (11th Cir. 2000).   There are, however, significant limitations on that potential liability.

The Supreme Court held in *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), that a municipality may not be held liable under § 1983 on a theory of *respondeat superior.*  In other words, "a municipality cannot be held liable solely because it employs a tortfeasor."  *Id*. at 691.  Instead, a municipality or county may be held accountable in damages for the conduct of a particular governmental actor only when the plaintiff shows that execution of the local

governmental entity's official "policy"[217] or "custom"[218] effectively was the *cause* of the injury at issue.  *Id.* at 694.  Stated somewhat differently, "[a] local government may be held liable under § 1983 only for acts for which it is actually responsible, 'acts which the [local government] has officially sanctioned or ordered.'"  *Turquitt v. Jefferson County*, 137 F.3d 1285, 1287 (11th Cir. 1998) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986)).

In certain circumstances, "municipal liability may be imposed for a single decision by municipal policymakers."  *Pembaur*, 475 U.S. at 480.  This sort of "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."  *Id.* at 481.  *See also Denno*, 218 F.3d at 1276.[219]  In a footnote of the *Pembaur* decision, the Supreme Court intimated that the phrase "possesses final authority" was to be construed broadly.  If, as the Court posited, a given "Board [of County Commissioners] *delegated* its power to establish final employment policy to the Sheriff [of the

---

[217] The Eleventh Circuit has defined a "policy" as "'a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality.'"  *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) (quoting *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997)).

[218] "A custom is a practice that is so settled and permanent that it takes on the force of law." *Sewell*, 117 F.3d at 489 (citing *Monell*, 436 U.S. at 690-91).

[219] "The determination of whether a municipal employee is the final decisionmaker [or policymaker] is a question of law." *Thomas v. Clayton County Board of Education*, 94 F. Supp. 2d 1290, 1313 (N.D. Ga. 1999) (citing *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989)).

County], [then] the Sheriff's decisions *would* represent county policy and could give rise to municipal liability." *Pembaur*, 475 U.S. at 483 n.12 (first emphasis supplied). The Eleventh Circuit has adopted this *dictum* as a bedrock principle of law. *See*, *e.g.*, *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1291 (11th Cir. 2004) ("A municipal governing body may be held liable for acts or policies of individuals to whom it delegated final decisionmaking authority in a particular area."). That said, one significant limitation is apparent from the Eleventh Circuit's opinions in this area: "the delegation must be such that the decision is not subject to review by the policymaking authority." *Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir. 2002).

The court is not satisfied that this case fits squarely into the delegation exception. Primarily, this is because it is not really accurate to say that the Lawrence County Board of Education "delegated" its policymaking authority to Rutherford. At the outset, "whether a particular official has 'final policymaking authority' is a question of *state law.*" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion) (emphasis in original). Alabama law strikes a balance of power between county superintendents and county boards of education in regards to policymaking authority on hiring and promotion policymaking decisions: superintendents must nominate a candidate, and the board must vote to hire, or not

-78-

hire, that nominee. *See*, *e.g.*, Ala. Code § 16-8-23.   Neither the board nor the superintendent can act without the other, and no construction of the relevant statutes would permit a consolidation of authority in a superintendent.   *See Hamilton v. Montgomery County Board of Education*, 122 F. Supp. 2d 1273, 1285 (M.D. Ala. 2000) ("Neither [the Board of Education nor the Superintendent] can make a personnel decision without the approval of the other.") (citing *Guyse v. Morgan County Board of Education*, 516 So.2d 692, 693 (Ala. Civ. App. 1987)).   As the Supreme Court has noted, "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Praprotnik*, 485 U.S. at 126.

The Eleventh Circuit held that the delegation doctrine does not apply to a similar situation where the plaintiff alleged that one county commissioner was allowed by his co-commissioners to unilaterally determine which county employees would be terminated pursuant to a reduction in force plan.  *See Matthews*, 294 F.3d at 1297.  The court noted that "even if Reynolds [the alleged delegatee] was given the power to select which positions would be eliminated in the [reduction in force], his selections still had to be accepted by a majority of the board.  As such, Reynolds never possessed final policymaking power himself; and the delegation doctrine does not apply."  *Id*.  The same is true here:  Rutherford's recommendations were, as a

matter of law, subject to approval by the Lawrence County Board of Education prior to having any force or effect.  *See also Holloman*, 370 F.3d at 1292 (holding that a government employee is considered a final policymaker "only if his decisions have legal effect *without further action* by the governing body, . . . and if the governing body *lacks the power* to reverse the member or employee's decision") (emphasis supplied); *Blalock v. Dale County Board of Education*, 84 F. Supp. 2d 1291, 1313 (M.D. Ala. 1999) (rejecting the argument that a school athletic director who made transfer recommendations to the Board of Education could be a final policymaker for the Board, where his "recommendation . . . had to be reviewed and ultimately voted on by the Board").

McElroy's response to all this is that the Board of Education did not provide *meaningful* review and, therefore, acted as a mere "rubber stamp."  (He alleges that all evidence indicates the Board routinely approved Rutherford's recommendations.) It is true that the Fifth and Eleventh Circuits have occasionally written of "meaningful" review, and alluded to the *possibility* of a "rubber stamp" exception. *See*, *e.g.*, *Morro v. City of Birmingham*, 117 F.3d 508, 514 (11th Cir. 1997) (holding that "a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review."); *Bowen v. Watkins*, 669 F.2d 979, 989 (5th Cir. 1982) ("If a higher official

has the power to overrule a decision but as a practical matter never does so, the decision-maker may represent the effective final authority on the question."). For two reasons, however, the court is not prepared to rest its decision upon these intimations.

First, this Circuit's carefully reasoned cases almost uniformly call for a mere "opportunity" for meaningful review. *See*, *e.g.*, *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1295 (11th Cir. 2000) ("The *opportunity* for meaningful review will suffice to divest an official of any policy making authority.") (emphasis supplied). *Accord Scala v. City of Winter Park*, 116 F.3d 1396, 1402, 1403 n.5 (11th Cir. 1997); *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 637-38 (11th Cir. 1991). *See also Denno*, 218 F.3d at 1277 ("*Scala* clearly states that this circuit equates meaningful review with the *opportunity* for meaningful review.") (emphasis supplied); *Kamensky v. Dean*, 148 Fed. Appx. 878, 880 (11th Cir. 2005) (discounting the so-called "rubber stamp" theory and stating that, "[m]ore recently, we [have] looked 'to whether there is an actual '*opportunity*' for 'meaningful' review' in determining whether a governmental decisionmaker is a final policymaker") (internal citation omitted) (emphasis in original). Certainly, such opportunity existed here. Moreover, other than his approval rate, there is no evidence in the record indicating that the Board failed to subject Rutherford's decisions to scrutiny.

Second, and more importantly, the Supreme Court has made clear that

"[s]imply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy." *Praprotnik*, 485 U.S. at 130 (also noting that "the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where (as here) the [alleged] wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale"). It is not at all clear to the court how a "rubber stamp" exception to the delegation doctrine could be squared with the plurality's controlling reasoning in *Praprotnik*. Accordingly, McElroy's § 1983 claims must be dismissed, insofar as they are directed at the Board of Education.

That said, for good reasons, the Board makes no argument that it should be dismissed as to the Title VII claims. For Title VII purposes, Rutherford is an agent of the Board, and his undisputedly integral role in the decisionmaking processes may be imputed to the Board in ascertaining a discriminatory animus. *See*, *e.g.*, *Harris v. Shelby County Board of Education*, 99 F.3d 1078, 1083 n.3 (11th Cir. 1996) (citing *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991)); *Gordon v. Dooly County School District*, No. 5-04-CV-124, 2005 WL 3560659, at * 3 (M.D. Ga. Dec. 28, 2005). *Cf. Schoenfeld v. Babbit*, 168 F.3d 1257, 1268 (11th Cir. 1999).

## C.   Liability of Superintendent Rutherford

Defending himself against McElroy's individual capacity claims under § 1983,

Rutherford alleges that he lacks the requisite official decisionmaking authority to be held liable under § 1983; and that, even if he did possess such authority, he would be due qualified immunity.   Because the court agrees with Rutherford's primary argument, it need not address his request for qualified immunity.

Just a few years ago, the Eleventh Circuit outlined the distinctions between the "final policymaker" question and the "official decisionmaker" conundrum:  "[t]he 'final policymaker' inquiry addresses who takes actions that may cause the municipality . . . to be held liable for a custom or policy.  The 'decisionmaker' inquiry addresses who has the power to make official decisions and, thus, be held *individually* liable."  *Quinn v. Monroe County*, 330 F.3d 1320, 1326 (11th Cir. 2003) (emphasis in original).  "[A]n official or formal decision-maker may often be identified by a rule, . . . or in the case of public entity employers, by examining the statutory authority of the official alleged to have made the decision."  *Id*. at 1328.

Here, the relevant Alabama statutes clearly denominate the Board of Education as the final decisionmaking authority on the issue of promotions.  As discussed previously, Superintendent Rutherford also plays an important role in the decisionmaking process — *i.e.*, the Board cannot act without his recommendation — but he lacks the necessary power to actually appoint an individual to a principalship or assistant principalship in the absence of approval by a majority of the members of

-83-

the Board.  *See* Ala. Code §§ 16-8-23, 16-9-23; *Hamilton*, 122 F. Supp. 2d at 1285.

*Cf. Quinn*, 330 F.3d at 1328 (holding that a county administrator could be held

individually liable where he "had the authority not merely to *recommend* Quinn's

termination but to immediately effectuate her termination" without approval of any

higher body) (emphasis in original).

Accordingly, Rutherford did not act as the final decisionmaker, and he cannot

be held individually liable under § 1983.  *Cf. Kamensky*, 148 Fed. Appx. at 880

("Thus, the evidence indisputably shows Dean had no power to terminate Kamensky,

but rather only had the power to recommend her termination.  Dean was not the

'official decisionmaker,' and thus cannot be held individually liable.").[220]

## PART FOUR

### *Conclusion*

In accordance with the foregoing, all claims against all defendants joined

herein are due to be dismissed *except* four Title VII-based failure to promote claims

brought against the Lawrence County Board of Education.  Those claims arise out of

the following four vacancies:  East Lawrence High School principal (2003); Speake

School principal (2003); Hatton High School assistant principal (2003); and Speake

---

[220] Though it was an unpublished decision, *Kamensky* also is notable for the fact the panel deciding that case rejected the plaintiff's entreaty "to create a 'rubber stamp' exception to *Quinn*'s 'decisionmaker' inquiry."  *Kamensky*, 148 Fed. Appx. at 880.

School assistant principal (2004).

An appropriate order will be entered contemporaneously herewith.

DONE this 6th day of September, 2007.

_____
United States District Judge